199 N.J. Super. 389 (1985)
489 A.2d 1175
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CURTIS GILMORE, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 2, 1984.
Remanded May 21, 1984.
Reargued October 17, 1984.
Decided March 8, 1985.
*394 Before Judges MATTHEWS, J.H. COLEMAN and GAULKIN.
Martin L. Greenberg argued the cause for appellant (Greenberg, Margolis, Ziegler & Schwartz, attorneys; Richard E. Mischel and Stephen M. Holden, on the briefs).
Alan A. Sant'Angelo, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by J.H. COLEMAN, J.A.D.
As we noted in our remand decision, the crucial question presented in this appeal is whether defendant's constitutional right to an impartial jury was violated by the assistant prosecutor's exclusion of all black prospective petit jurors by the use of peremptory challenges. We conclude that the assistant prosecutor systematically excluded all black prospective petit jurors based on group association, rather than individual bias, and that his conduct was in violation of N.J. Const. (1947), Art. I, ¶ 5, ¶ 9 and ¶ 10. We therefore reverse the judgment of conviction and order a new trial without a showing of any other prejudice.

*395 I

FACTUAL AND PROCEDURAL HISTORY.
In a single jury trial, defendant was found guilty of three first degree robberies of two Hispanic attendants at Carmine's Exxon gasoline station, Route 22, Union, New Jersey. The robberies occurred on July 28, 1981, August 21, 1981 and August 22, 1981. Defendant was sentenced to three concurrent 15 year custodial terms with five years of parole ineligibility.
Defendant, who is black, was tried to an all-white jury, comprised of six males and six females. Defense counsel was black and the assistant prosecutor was white. During the jury selection, nine black potential jurors were seated in the jury box at different times. Two of them were excused for cause. The assistant prosecutor used 11 of the 12 peremptory challenges allowed him by R. 1:8-3(d). He excused the remaining seven black prospective jurors. Defense counsel exhausted his 20 peremptory challenges.
At the conclusion of the jury selection, but before the jury was sworn, defense counsel moved for a mistrial. He contended that the assistant prosecutor used his peremptory challenges to excuse the remaining seven black prospective jurors based on race alone. He argued:
... the total number of black jurors that were in the panel were nine, that one lady was excused because of physical incapacity. Another lady indicated, in fact, that she could not serve and be observant because she had been the victim of a theft of a radio from her car. And the other seven, your Honor, seated in the jury panel, it is that the prosecutor used out of his 12 [11] challenges seven to excuse those blacks.
In response to the motion for a mistrial, the assistant prosecutor stated:
It's my understanding of the rules that I can exercise my peremptory challenges as I see fit. It's my judgment that the people I have excused, the majority are blacks, but I did excuse certain whites. I have a right to excuse them, just as [defense counsel] had a right to excuse some of the older white businessmen on the jury. He exhausted his challenges.
The trial judge relied heavily on Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) and State v. Smith, 55 *396 N.J. 476, 479-484 (1970), cert. den. 400 U.S. 949, 91 S.Ct. 232, 27 L.Ed.2d 256 (1970) in rejecting defendant's constitutional argument. On defendant's appeal following his conviction, we recognized that the black prospective jurors were not identified in the record and that the decisional law in this State did not compel the assistant prosecutor to explain the reasons for his use of peremptory challenges; we therefore remanded the case to the Law Division "to establish the identity of the black prospective jurors and to afford the assistant prosecutor an opportunity to establish his motive or reasons for excusing each of the seven prospective black jurors." State v. Gilmore, 195 N.J. Super. 163 at 166. The remand hearing was conducted on June 28, 1984. After the remand, we granted defendant bail pending disposition of the appeal.

II

PRIOR LAW IS NOT DISPOSITIVE.
In State v. Smith, 55 N.J. at 483-484, our Supreme Court held that defendant had failed to establish "any practice of systematic exclusion of Negroes" or that all of the black prospective jurors had been excluded by the use of peremptory challenges solely because of their race. The Court in Smith accordingly found that the use of peremptory challenges by the assistant prosecutor and defense counsel did not violate federal constitutional law announced in Swain v. Alabama, supra. Our Supreme Court did not consider whether the use of peremptory challenges, N.J.S.A. 2A:78-7 and R. 1:8-3(d), based solely on group association rather than individual bias would violate the New Jersey Constitution. Likewise, the decision in State v. Johnson, 125 N.J. Super. 438, 439 (App.Div. 1973) was based on Swain v. Alabama, supra and did not consider the issue under our State Constitution. While the United States Constitution remains the primary source of fundamental rights, it is now well established that we may look to our State Constitution to provide a higher level of protection of personal *397 rights than those guaranteed by the federal constitution. Oregon v. Kennedy, 456 U.S. 667, 681, 102 S.Ct. 2083, 2092, 72 L.Ed.2d 416, 428 (1982); Pruneyard Shopping Center v. Robins, 447 U.S. 74, 78-81, 100 S.Ct. 2035, 2039-2040, 64 L.Ed.2d 741, 750-752 (1980); Oregon v. Hass, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 575-576 (1975); Right to Choose v. Byrne, 91 N.J. 287, 299-300 (1982); State v. Hunt, 91 N.J. 338, 359 (1982); State v. Alston, 88 N.J. 211, 225 (1981); State v. Schmid, 84 N.J. 535, 553-560 (1980); State v. Johnson, 68 N.J. 349, 353-354 (1975). Distinguished jurists and scholars have encouraged state courts to look to their state constitutions as a supplemental source of fundamental rights which may surpass those guaranteed by the federal constitution. Note, "Developments in the Law  The Interpretation of State Constitutional Rights," 95 Harv.L.Rev. 1324, 1326-1328 (1982); see Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harv.L.Rev. 489, 491-495 (1977); Pollock, "State Constitutions as Separate Sources of Fundamental Rights," 35 Rut.L. Rev. 707, 708 (1983). For the reasons which follow, we are satisfied that the New Jersey Constitution provides greater protection against the discriminatory use of peremptory challenges than the United States Supreme Court has afforded under the United States Constitution.

III

STATE CONSTITUTIONAL REQUIREMENTS FOR A FAIR AND IMPARTIAL JURY IN A CRIMINAL CASE.
Article I of the New Jersey Constitution, paragraph 5 provides "[n]o person shall be denied the enjoyment of any civil ... right, nor be discriminated against in the exercise of any civil... right ... because of ... race, color, ancestry or national origin." Paragraph 9 provides "[t]he right of trial by jury shall remain inviolate; ...." Finally, paragraph 10 provides "[i]n all criminal prosecutions the accused shall have the *398 right to a speedy and public trial by an impartial jury; ...." Read together, these paragraphs of Article I guarantee that a defendant in a criminal case is entitled to a jury trial by a fair and impartial jury without discrimination on the basis of race, color, ancestry or national origin.
That guarantee has long and consistently been articulated in our case law. As long ago as 1900, the then Court of Errors and Appeals held that prospective jurors may not be "designedly excluded on account of color" from petit jury lists. Bullock v. State, 65 N.J.L. 557, 564 (E. & A. 1900). In State v. Stewart, 2 N.J. Super. 15, 24 (App.Div. 1949), Judge (later Justice) Jacobs stated that "in the drawing of jury panels, grand or petit, there must be no intentional discrimination against persons because of their color." And in State v. Rochester, 54 N.J. 85 (1969), our Supreme Court found that "[n]o one may be disqualified from service as a grand or petit juror because of `race, color, creed, national origin, or ancestry'" (citing N.J.S.A. 2A:72-7) and held that "[t]he methods of selection must be so designed as to insure that juries are impartially drawn from community cross-sections." 54 N.J. at 88. (citations omitted). Our cases accord with a long line of federal cases. Williams v. Florida, 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 446, 460 (1970); Apodaca v. Oregon, 406 U.S. 404, 410-411, 92 S.Ct. 1628, 1632-1633, 32 L.Ed.2d 184, 191 (1972); Johnson v. Louisiana, 406 U.S. 356, 378, 92 S.Ct. 1620, 1642, 32 L.Ed.2d 152, 169 (1972); Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). Even though New Jersey established the representative cross-section rule as early as 1949 in Stewart, the rule, however, was not made applicable to the states through the Sixth Amendment until the decisions in Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), reh. den. 392 U.S. 947, 88 S.Ct. 2270, 20 L.Ed.2d 1412 (1968) and Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). See State v. Porro, 158 N.J. Super. 269 (App.Div. 1978), cert. den. 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978).
*399 The purpose of the representative cross section rule was summarized in Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946). The court observed:
Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.
In the same connection, Justice Black said:
It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government. [Footnote omitted] [Smith v. Texas, 311 U.S. at 130, 61 S.Ct. at 165]
The rationale for establishing the representative cross section rule is anchored in the fact that in our heterogeneous society jurors belong to many diverse groups. The groups are often defined by race, sex, age, religion and national or ethnic origin. The larger group is often further defined by education, economic condition, place of residence, occupation and political affiliation. Frequently, groups overlap one another.
The cross section representation rule does not require the systematic inclusion of the diverse, cognizable groups. See State v. Stewart, supra. It requires that a cognizable group cannot be intentionally or systematically excluded. While defendant in the present case has no right to insist that Blacks serve on his trial jury or that there be proportional representation of Blacks on the jury, State v. Zicarelli, 154 N.J. Super. 347 (App.Div. 1977), certif. den. 75 N.J. 601 (1978), he does have the unqualified right to be tried by a fair and impartial jury. In New Jersey the right to trial by a jury drawn from a representative cross section of the community is guaranteed by N.J. Const. (1947), Art. I, ¶ 5, ¶ 9 and ¶ 10, independently of the Sixth Amendment to the federal constitution.
Although the representative cross section rule is implicated in the entire jury selection process, we are here called upon to deal *400 only with the use of peremptory challenges. While the right to a fair and impartial jury is of constitutional dimensions, the right to peremptory challenges is not. Rather, it is the product of the Legislature's and the Supreme Court's rule making authority. See N.J.S.A. 2A:78-7 and R. 1:8-3(a). Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) has established that a peremptory challenge can be subject to constitutional scrutiny. See Wainwright v. Witt, ___ U.S. ___, ___, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) which modified the Witherspoon standard for use of challenges for cause in a death penalty case.
Historically, peremptory challenges have been used to excuse prospective jurors without any statement of reasons and without being subject to the court's control. This history was traced to the year 1305 in Swain v. Alabama, supra, 380 U.S. at 220, 85 S.Ct. at 835. Peremptory challenges, when properly used, are intended to insure that the triers of facts will be "as nearly impartial `as the lot of humanity will admit.'" State v. Singletary, 80 N.J. 55, 62 (1979); State v. Deatore, 70 N.J. 100, 105-106 (1976); State v. Jackson, 43 N.J. 148, 158 (1964). Currently, all of the states except Alabama, Virginia and West Virginia permit the use of peremptory challenges. Those three states use struck juries instead. The number of challenges vary widely, from a low of 3 to a high of 26, depending upon the nature of the crime charged or the sentence which can be imposed.[1]
Because the peremptory challenge is not of constitutional origin, its use must yield when in conflict with our State constitutional guarantee that juries be impartially drawn from community cross-sections. If identifiable groups may not arbitrarily *401 be excluded from the petit jury lists (State v. Rochester, supra, 54 N.J. at 88-89), then we surely cannot permit such exclusions to be worked by an arbitrary or discriminatory use of peremptory challenges. We find unavoidable the conclusion that our State constitution guarantees that the use of peremptory challenges may not restrict unreasonably the possibility that the petit jury will comprise a representative cross-section of the community. Cf. McCray v. Abrams, 750 F.2d 1113 (2d Cir.1984).

IV

PERMISSIBLE EXERCISE OF PEREMPTORY CHALLENGES.
We now define how peremptory challenges may be used without violating our State constitution. The procedure adopted first in California and later followed in Massachusetts charts the appropriate course.[2]
In People v. Wheeler, 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978), the court observed:
The purpose of the challenges also dictates their scope: they are to be used to remove jurors who are believed to entertain a specific bias, and no others....
* * * * * * * *
For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional lifestyle. In turn, a defendant may suspect prejudice on the part of one juror because he has been the victim of a crime or has relatives in law enforcement, and on the part of another merely because his answers on voir dire evince an excessive respect for authority. Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the `sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' (4 Blackstone, Commentaries 353) [1807]  upon *402 entering the box the juror may have smiled at the defendant, for instance, or glared at him. Responsive to this reality, the law allows removal of a biased juror by a challenge for which no reason `need be given,' i.e., publicly stated: in many instances the party either cannot establish his reason by normal methods of proof or cannot do so without causing embarrassment to the challenged venireman and resentment among the remaining jurors. [Footnote omitted]
All of these reasons, nevertheless, share a common element: they seek to eliminate a specific bias as we have defined that term herein  a bias relating to the particular case on trial or the parties or witnesses thereto. By the same token, they are essentially neutral with respect to the various groups represented on the venire: the characteristics on which they focus cut across many segments of our society. Thus both blacks and whites may have prior arrest, both rich and poor may have been crime victims, both young and old may have relatives on the police force, both men and women may believe strongly in law and order, and members of any group whatever may alienate a party by `bare looks and gestures.' It follows that peremptory challenges predicated on such reasons do not significantly skew the population mix of the venire in one direction or another; rather, they promote the impartiality of the jury without destroying its representativeness.
By contrast, when a party presumes that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds  we may call this `group bias'  and peremptorily strikes all such persons for that reason alone, he not only upsets the demographic balance of the venire but frustrates the primary purpose of the representative cross-section requirement. That purpose, as we have seen, is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences. Manifestly if jurors are struck simply because they may hold those very beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority. Seen in this light, the presumed group bias that triggered the peremptory challenges against its members is indistinguishable from the group perspective we seek to encourage by the cross-section rule. [Footnote omitted]
We conclude that the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article 1, section 16, of the California Constitution. This does not mean that the members of such a group are immune from peremptory challenges: individual members thereof may still be struck on grounds of specific bias, as defined herein. [Footnote omitted]
* * * * * * * *
What it does mean, however, is that a party is constitutionally entitled to a petit jury that is as near as approximation of the ideal cross-section of the community as the process of random draw permits. Obviously he cannot avoid the effect of that process: the master list must be reduced to a manageable venire, and that venire must in turn be reduced to a 12-person jury. The best *403 the law can do to accomplish those steps with the least risk to the representative nature of the jury pool is to take them by random means, i.e., by drawing lots. We recognize that in a predictable percentage of cases the result will be a wholly unbalanced jury, usually composed exclusively of members of the majority group. This is inevitable, the price we must pay for juries of a workable size. It is no less inevitable, however, that in all other instances  as in the case at bar  the representative nature of the pool or venire will be reflected at least in some degree in the 12 persons called at random to the jury box. It is that degree of representativeness  whatever it may prove to be  that we can and must preserve as essential to trial by an impartial jury. Certainly the prospective jurors are then subject to challenges for cause and peremptory challenges on grounds of specific bias; but for the reasons stated above we cannot countenance the decimation of the surviving jurors by peremptory challenges on the ground of group bias alone. [148 Cal. Rptr. at 902-904, 583 P.2d at 760-762]
Obviously, there must be some balancing of the goal of impartiality in the petit jury and the limitations inherent in a feasible and fair process of jury selection.[3] Peremptory challenges can play a significant role in seeking to eliminate partiality on both sides. Since the use of peremptory challenges is an incursion into the cross-sectional representation balance required, we hold it can only be used to eliminate prospective jurors based on individual bias, also known as specific bias: a bias which relates to the case on trial, the parties, attorneys or witnesses in the case. People v. Wheeler, 148 Cal. Rptr. at 906-907, 583 P.2d at 764-765.
The showing of individual bias need not rise to the level required to have a juror excused for cause.
There are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the ... response and of being alert to reasons that are pretextual. See, e.g., People v. Hall, 35 Cal.3d 161 [197 Cal. Rptr. 71, 75], 672 P.2d 854, 858 (1983).... [McCray v. Abrams, supra, (750 F.2d at 1132)]
*404 Our decision today does not intrude upon the right to challenge a juror for cause, which right is created by N.J.S.A. 2A:78-6. The statutory grounds for removal for cause are found in N.J.S.A. 2A:69-1 which provides:
Every person, male and female, summoned as a grand juror, and every petit juror returned for the trial of any action of a civil or criminal nature in any of the courts of this State shall be a citizen of this State for at least 2 years; over 21 and under 75 years of age; a resident of the county from which he shall be taken; shall not have been convicted of a crime; and shall not at the time of his selection, be a person who through his office, position or employment is either directly or indirectly connected with the administration of justice. Such person shall be able to read, write and understand the English language and shall not have any mental or physical disability which will prevent him from properly serving as a juror.
The minimum age was lowered to 18 by L. 1972, c. 81, ¶ 1, now N.J.S.A. 9:17B-1. N.J.S.A. 2A:78-6 also provides that it is cause for removal when the person "has served as a petit juror within the preceding year." Decisional law has expanded the statutory grounds for removal for cause to include situations in which the potential for prejudice is so blatant that as a matter of law the juror is disqualified. State v. Grillo, 16 N.J. 103 (1954) (venireman was acquainted with trial witnesses); State v. Jackson, 43 N.J. 148 (1964) (a friend of the State's key witness); State v. Deatore, 70 N.J. 100 (1976) (close relationship with the victim); State v. Singletary, 80 N.J. at 64 (recent victim of a similar crime) are but a few examples.
The State has wide discretion to use its peremptory challenges in a constitutional manner, provided its use does not deliberately destroy the representative cross section. Undoubtedly, members of each group which comprise the jury may share many of the same individual biases, and each group may have biases unique to that group. But it is the interaction of the differing attitudes of the various groups in the jury room that the representative cross section rule was designed to foster in the hope that in the end the attitude of one group would cancel out the other. One commentator has observed:
The absence of a group from petit juries in communities where the group represents a substantial portion of the population may lead to jury decision *405 making based on prejudice rather than reason. For example, a black defendant, faced with an all-white jury, consistently runs a greater risk of conviction, of conviction of a more severe offense, and of harsher punishment than a white defendant. White jurors, satisfied that blacks will never sit in judgment upon themselves or their white neighbors, can safely exercise their prejudices.
Note, "Limiting the Peremptory Challenge: Representation of Groups on Petit Juries."; 86 Yale L.J. 1715, 1730-1731 n. 69 and also see 1733, n. 77 (1977). In the same connection, Justice Marshall stated:
[w]hen any large and identifiable segment of the community is excluded from the jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented. [Peters v. Kiff, 407 U.S. 493, 503-504, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972)].
Group association is no evidence of individual or specific bias. Members of the group may indeed share certain attitudes or experiences as a result of their association. As Justice Marshall suggested, certain characteristics of groups imbue their members with unique perspectives which are vital in the jury room. Unless the use of peremptory challenges is limited to exclude persons with a specific bias, the challenge becomes a tool to completely nullify the cross-sectional representation and the diffused impartiality of the jury discussed in Witherspoon v. Illinois, 391 U.S. at 518, 88 S.Ct. at 1775, 20 L.Ed.2d at 782-783. This same or a similar approach has been followed in Commonwealth v. Soares, 377 Mass. 461, 387 N.E.2d 499 (1979), cert. den. 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); State v. Crespin, 94 N.M. 486, 612 P.2d 716 (Ct.App. 1980); State v. Neil, 457 So.2d 481 (Fla. 1984). See also McCray v. Abrams, 576 F. Supp. 1244 (E.D.N.Y. 1983), aff'd in part, 750 F.2d 1113 (2d Cir.1984).
We interpret N.J. Const. (1947), Art. I, ¶ 5, ¶ 9 and ¶ 10 as proscribing the use of peremptory challenges to exclude prospective jurors solely by virtue of their membership in, or affiliation with, a cognizable group, a practice designed to *406 defeat the purpose of the representative cross section rule. The possibility of having a jury mirror the cross section of the community cannot be systematically reduced or eliminated based on perceived group bias alone. By cognizable group we mean those who are protected under the representative cross section rule by (1) the Sixth Amendment as defined in Taylor v. Louisiana, 419 U.S. at 531, 95 S.Ct. at 698 and Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); (2) N.J. Const. (1947), Art. I, ¶ 5, and (3) New Jersey Laws Against Discrimination, N.J.S.A. 10:5-1 et seq. Blacks clearly constitute a protected group. Invidious discrimination cannot be condoned because it is not only injurious to the individual, but to the community as a whole. In Strauder v. West Va., 100 U.S. (10 Otto) 303, 308, 25 L.Ed. 664, 665-666 (1880), it was stated that excluding Blacks from jury service injured black potential jurors as well as defendants; the potential jurors are stigmatized as unfit to serve. The stigma is just as detrimental to those who are uninterested in jury service as those who ardently desire it; both groups are denied the "privilege of participating equally ... in the administration of justice." In this same connection, it was observed in Rose v. Mitchell, 443 U.S. 545, 555, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739, 749 (1979), that "[d]iscrimination on the basis of race, odious in all respects, is especially pernicious in the administration of justice."
As we observed earlier, the rule is designed to protect minority groups in the community. In a criminal case, the rule serves the same purpose regardless of whether the defendant, the victim, or both come from the same cognizable group. By way of illustration, we note that the 1983 Annual Report of the Department of Corrections states that 73% of all defendants sentenced to the State Prison system are Black and Hispanic, consisting of 63% Black and 10% Hispanic. The 1980 census indicates that Blacks and Puerto Ricans over the age of 18 do not exceed 25% of the population in any county of the State. Under our nondiscriminatory rule, it will be numerically improbable for a member of a minority group to stack the jury. We *407 do not envision that our decision today will permit reverse discrimination against whites. The representative cross section rule, which is the core of our decision, was designed to protect the minority population in the selection of grand and petit juries. By design, it seeks to prevent systematic exclusion of minorities. A minority defendant is apt to exhaust his or her peremptory challenges before he or she can eliminate all prospective jurors identified with the majority.[4] See Commonwealth v. Soares, 387 N.E.2d at 515-516.

V

PROCEDURE AND BURDEN OF PROOF WHERE IMPROPER USE OF PEREMPTORY CHALLENGES IS ALLEGED.
The procedure to be followed where an unconstitutional use of peremptory challenges is alleged is not an easy one and will place substantial reliance upon the trial judges for enforcement. We begin with a presumption that the State has exercised its peremptory challenges in a manner that is permissible under N.J. Const. (1947), Art. I, ¶ 5, ¶ 9 and ¶ 10. We believe this presumption is necessary in order to effectuate the legislative intent expressed in N.J.S.A. 2A:78-7. But that is only a rebuttable presumption; otherwise, a jury could be constituted in total disregard of the constitutional requirements we have outlined.
*408 In order to rebut that presumption of propriety, a defendant who believes the State is using peremptory challenges to strike jurors on the basis of group association rather than personal bias must make a timely objection, i.e., prior to swearing the jury. The defendant must then make a prima facie showing to the satisfaction of the court that the objection has merit. Next, the defendant must establish that the persons excluded are members of a cognizable group constituting part of the representative cross section of the community. The burden is on the defendant to demonstrate a strong likelihood that the State has excused prospective jurors solely because of group association rather than personal bias. See McCray v. Abrams, supra, (750 F.2d at 1132); People v. Wheeler, 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748. The defendant need not be a member of the excluded group in order to object to a violation of the representative cross section rule.
Where the court finds that a prima facie case has been established, the burden shifts to the State to demonstrate that peremptory challenges have not been used to strike members of a cognizable group protected by the representative cross section rule predicated on group bias alone. The State need not show reasons rising to the level of cause for the exercise of its peremptory challenges; it need only show a genuine and reasonable ground for believing that a prospective juror might have an individual or personal bias that would make excusing him or her rational and desirable. If the State refuses to explain its actions, the presumption of validity is rebutted and a mistrial must be declared.
Where the State does undertake to justify its exercise of peremptory challenges, the trial judge must determine whether the explanations proffered by the State are genuine and must weigh those explanations against the showing made by defendant. Upon that weighing the trial judge must then determine whether the defendant has rebutted, by the preponderance of the evidence, the presumption of constitutional exercise *409 of the peremptory challenges. If the defendant is found to have sustained his burden of proving an unconstitutional exercise of peremptory challenges, then the jury selection must be commenced anew.
Trial judges, of course, will be required to make difficult and close judgments in these matters from time to time:
Decisions concerning the potential bias of prospective jurors are primarily subjective in nature. They require at bottom a judgment concerning the juror's credibility as he responds to questions designed to detect whether he is able to sit as a fair and impartial trier of fact. Consequently, such evaluations are necessarily dependent upon an observation of the juror's demeanor during the course of voir dire. ... [State v. Singletary, 80 N.J. 55, 63 (1979)]
We are nevertheless confident that the judges' experiences and feel for the case qualify them to distinguish bona fide reasons "from sham excuses belatedly contrived to avoid admitting acts of group discrimination." People v. Wheeler, 148 Cal. Rptr. at 907, 583 P.2d at 765.
We have no doubt that further litigation will be needed to illuminate and fine tune the complex process of jury selection free of racial discrimination. However, justice cannot "sit supinely by and be flaunted in case after case before a remedy is available." Commonwealth v. Martin, 461 Pa. 289, 299, 336 A.2d 290, 295 (1975) (Nix, J., dissenting).

VI

ANALYSIS OF THE RECORD AND APPLICATION OF LAW.
At the end of the jury selection, defense counsel sought a mistrial based upon the contention that the assistant prosecutor had systematically excluded all qualified Blacks from the jury based solely on racial discrimination. The motion was denied and we remanded the case to afford the assistant prosecutor an opportunity to explain his reasons for excusing all the Blacks. We now evaluate his explanations in view of the applicable standards which we have announced today.
*410 The assistant prosecutor used seven of his peremptory challenges to remove all black prospective jurors who were not excused for cause. These seven persons have been identified as Wendell Rodgers, Curtis J. Boykin, Wallace Overby, Jr., Jean Louis Dedon, John D. Bailey, Moses Bryant and Robert L. Rawlins or Margaret Daniels. The assistant prosecutor relied upon the transcript of the jury selection and notes he made the day after the trial judge denied defendant's motion for a mistrial based upon alleged racial discrimination. The assistant prosecutor was aware that defendant is the son of a Baptist minister from the Newark area. He admittedly assumed that Blacks were predominantly Baptist. It was anticipated that defendant's parents and other Baptist ministers would be alibi and/or character witnesses. The assistant prosecutor stated that he wanted a jury that would not be swayed by emotions. He said he wanted jurors who were (1) able to ignore theatrics, (2) more intelligent and of the professional type, and (3) were without maternal family instincts.
The assistant prosecutor's admission that he excluded Blacks because he assumed they were predominately Baptist and would tend to favor the defense is a clear illustration of group bias. He further admitted that [black] women's maternal instincts would make them favor the defendant. This too was an indication of group bias, violative of Taylor v. Louisiana, 419 U.S. at 530-533, 95 S.Ct. at 697-699. Not only did he exclude a disproportionate number of Blacks, but he excluded all of them. Hence, we are satisfied that a prima facie case of improper exercise of peremptory challenges was established under today's guidelines by defense counsel at the time he made the motion for a mistrial. The presumption of proper use of the peremptory challenges now gives way and the burden shifts to the assistant prosecutor to justify the use of his seven peremptory challenges on nonracial grounds.
Relying on the evidence produced at the remand hearing, the State argues that Rodgers, a laboratory technician, lived in *411 Hillside which is near Newark. It argues that this prospective juror was excused because he might be influenced by the testimony of defendant's father who is a Baptist minister. Boykin was excused because he was related to a person who had been convicted of a crime and because he might know a potential defense witness, defendant's girlfriend. Overby, a truck driver who also resided in Hillside, was excused because he was a truck driver  not the professional or intellectual type  as well because he lived close to Newark and might be influenced by the testimony of defendant's father. The record, however, is clear that the assistant prosecutor had no notes to help refresh his recollection of the reason for excusing Overby. The State had urged that Rawlins would not look at the assistant prosecutor or if he did, he looked at him with a "mean face."
Dedon, a housewife, was excused because of her perceived maternal instincts for believing the alibi evidence. Another female, Margaret Daniels, was also excused because of her maternal instincts and her employment as a clerk typist. Interestingly, the assistant prosecutor permitted three white housewives, Jane Hoffman, Alsa Musta and Gloria Dultz, to remain on the jury. Also, two white female secretaries, Ellen Bergland and Loretta Rake, were not excused by the prosecutor. They, presumably, had the same "maternal instincts" and were not the "professional or intellectual type."
Bailey, a window washer from Plainfield, was excused because the State wanted a more professional type juror and the assistant prosecutor thought he knew a mutual friend. Finally, Bryant, a Plainfield resident employed by the State of New York as a therapist, was excused because he was the "counsellor-type" person who tends to sympathize with defendants.
The assistant prosecutor was undoubtedly aware that the State had a substantial case. In these circumstances, we find the assistant prosecutor's explanation that only the intellectual type was suitable for jury duty lacks genuineness. We perceive no reasonable relevancy between the issues to be resolved *412 by the jury and the high intellectual achievement of jurors. Moreover, the record does not suggest that the assistant prosecutor insisted on intellectual achievement from white jurors. The real issue in each of the robberies was essentially one of identification of defendant as the perpetrator; that was not a very complicated issue.
Also, all black males and females were eliminated regardless of education, occupation, place of residence, or social or economic conditions. Additionally, no real attempts were made to bring out on voir dire whether the Blacks harbored any specific bias. The assistant prosecutor never endeavored to find out whether Boykin really knew defendant's girlfriend. Even though possible bias may have been established as to Boykin, we are convinced from our review of the record made on the remand that the assistant prosecutor has failed to demonstrate that he did not use his peremptory challenges to exclude the remaining six Blacks from the jury based solely on their group membership rather than individual bias. Notably, the assistant prosecutor said he did not want the "uneducated" persons living close to Newark or women because they have "maternal instincts" which tend to favor defendants serving as jurors. But he only excused black women for those reasons while leaving four white women on the jury who fit perfectly within his guidelines. Rodgers, who was black, and James Woods, who was white, lived in Hillside which is close to Newark. Both were educated; Rodgers as a laboratory technician, and Woods as a county supervisor. Yet, Rodgers was excused and Woods was not. Race was the only real distinction. Overby, a truck driver, also lived in Hillside. He was excused presumably because he was not the intellectual type. The remaining three whites excused by the assistant prosecutor, Joel DuPlessis, David Tackas and Richard Kamunder, were excused because they were friends or relatives of law enforcement officials or because they had been the victim of a crime.
Hence, we are persuaded that the assistant prosecutor's reasons or explanations were "sham excuses belatedly contrived *413 to avoid admitting acts of group discrimination against all the black prospective jurors." People v. Wheeler, supra, 22 Cal.3d at 282, 148 Cal. Rptr. at 907, 583 P.2d at 765. We hold that defendant sustained his burden of proving that the State used its peremptory challenges to engage in invidious racial discrimination in violation of N.J. Const. (1947), ¶ 5, ¶ 9 and ¶ 10. While we do not rest our decision on a violation of the Sixth Amendment to the federal constitution, we have no doubt that the assistant prosecutor's conduct also deprived defendant of an impartial jury trial under the Sixth Amendment as recently interpreted by McCray v. Abrams, 750 F.2d 1113, supra.

VII

REMEDY AFFORDED.
We recognize that every constitutional violation does not entitle a criminal defendant to a new trial. But here the violation goes to the integrity of the process that convicted defendant. Errors "which impact substantially and directly on fundamental procedural safeguards, and particularly upon the sensitive process of jury deliberations, are not amenable to harmless error rehabilitation.... A defendant confronted with this kind of trial error need not demonstrate actual prejudice in order to reacquire his right to a fair trial." (citation omitted). State v. Czachor, 82 N.J. 392, 404 (1980); see State v. Wagner, 180 N.J. Super. 564, 567 (App.Div. 1981). The right to an impartial jury "goes to the very essence of a fair trial." State v. Williams, 93 N.J. 39, 60 (1983). A reversal is required in order to assure that right.
The final important matter we must address is whether our holding is to be given prospective or retroactive application. Since the rule we have enunciated rests on State constitutional grounds, and is a new rule of law, it is to be given prospective application only. Our holding limiting the use of peremptory challenges is a complete break with the past. Retroactive application would not serve the purpose of the rule nearly as *414 much as the confusion and substantial adverse impact on the administration of justice. Retroactive application would require reopening virtually every criminal conviction. Moreover, both prosecutor and defense counsel have placed substantial reliance upon the former rule. United States v. Johnson, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); State v. Nash, 64 N.J. 464, 469-470 (1974); State v. Burstein, 85 N.J. 394, 406 (1981); State v. Carpentieri, 82 N.J. 546, 549 (1980); State v. Czachor, 82 N.J. at 408-409. The new rule announced today will apply to this case, see Stovall v. Denno, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967), trials in which the jury selection commenced on or after the date of this opinion and cases now on appeal in which the issue was preserved in the trial court. One possible exception may be cases in which a defendant is under sentence of death. By statute, such appeals go directly to our Supreme Court. N.J.S.A. 2C:11-3e.
In view of our decision to reverse based on denial of the right to a fair and impartial trial, we need not reach the other contentions raised on this appeal. We have carefully examined each of them, however, and find they are clearly without merit. R. 2:11-3(e)(2).
The judgment of conviction is reversed and the case is remanded to the Law Division for a new trial.
NOTES
[1] We must note that a reduction in the number of available peremptory challenges would likely reduce the frequency and scope of constitutional challenges to their exercise. Senate Bill No. 2046 would significantly reduce the number of challenges. The Criminal Practice Committee is also studying related problems.
[2] The Attorney General has not raised in this case the questions whether or to what extent defendant should also be limited in the exercise of his peremptory challenges. Judicial self-restraint constrains us to defer until another day a decision on such questions.
[3] Unlike many states, in New Jersey the jury voir dire questioning is conducted primarily by the trial judge. State v. Manley, 54 N.J. 259 (1969); State v. Howard, 192 N.J. Super. 571 (App.Div. 1983); R. 1:8-3.
[4] The 1980 census reveals in the following counties the Black and Puerto Rican population respectively of persons who were 18 years of age and older: Atlantic 11% and 1.5%; Bergen 2.5% and 0.5%; Burlington 7% and 1%; Camden 8% and 1%; Cape May 4% and 0.5%; Cumberland 8% and 4%; Essex 22% and 3%; Gloucester 5% and 0.5%; Hudson 12% and 5%; Hunterdon 1% and 1%; Mercer 11% and 1%; Middlesex 3.5% and 2%; Monmouth 5% and 1%; Morris 2% and 0.5%; Ocean 1% and 1%; Passaic 7% and 4%; Salem 9% and 0.5%; Somerset 3% and 0.5%; Sussex 0.5% and 0.5%; Union 10% and 1%; and Warren 0.5% and 0.5%.