**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0700-18T2

JENNIFER O'CONNOR
(Administratrix Ad Prosequendum)
on behalf of the ESTATE OF
JAYDEN O'CONNOR, a/k/a
JAYDEN GARZONE, an Infant
(Deceased), and JENNIFER
O'CONNOR, Individually,

     Plaintiff-Appellant,

v.

RIVERSIDE PEDIATRIC GROUP,
PC, SADRUL ANAM, M.D., and
WILSON DELGADO, M.D.,

     Defendants-Respondents.

_____

Submitted November 12, 2019 – Decided September 2, 2020

Before Judges Rothstadt and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-4996-16.

Mitchell L. Brown, attorney for appellant.

Marshall Dennehey Warner Coleman & Goggin, attorneys for respondents (Walter F. Kawalec, III, on the brief).

PER CURIAM

Plaintiff Jennifer O'Connor appeals from a jury verdict finding that defendants Riverside Pediatric Group, Dr. Sadrul Anam, and Dr. Wilson Delgado were not negligent in their care of plaintiff's decedent, Jayden O'Connor. On appeal, plaintiff raises several arguments related to the trial judge's alleged errors during jury selection, and she contends that these cumulative errors necessitate reversal of the jury's verdict and a new trial. Based on our review of the record and the governing legal principles, we affirm.

We discern the following facts from the record. On December 15, 2016, plaintiff filed a complaint and jury demand on behalf of the estate of her son, Jayden, against defendants for medical malpractice that resulted in Jayden's death. Jayden, who was eighteen months old at the time of his death, suffered from X-linked Severe Combined Immune Deficiency. Plaintiff alleged that as a result of defendants' failure to properly examine Jayden and their deviations from the standard of care, Jayden was deprived of the opportunity to undergo a life-saving bone marrow transplant, which caused him to suffer extreme pain and discomfort and a decreased quality of life, and ultimately caused his death.

At the start of jury selection, a juror questionnaire was distributed to the jury pool. The questionnaire contained four sections and asked questions including whether the potential jurors or their family members or close friends had ever worked in the medical profession or investigated medical or personal injury claims; had ever experienced the loss of a child; had ever suffered from a chronic disease that impacts the immune system or any other disabling illness; or were pregnant at the time. It also asked, "If the law and evidence warranted, would you be able to render a verdict in favor of the plaintiff or defendant regardless of any sympathy you might have for either party?" (question thirteen). Attached to the questionnaire was a photograph of Jayden in the Intensive Care Unit.

According to plaintiff, prior to jury selection, plaintiff's counsel objected to the photograph in chambers, contending that it would bias the process. Thereafter, on the record, the judge noted that the "only thing left of any contention was whether or not we should show the jury pool a copy of the photo," and he asked if defense counsel was stipulating that the photograph be admitted into evidence. As defense counsel was stipulating the admission, the judge allowed the photograph to be shown to the jury pool, stating he did not "see a problem with it" or "see anything prejudicial because they're going to see

3

it anyway." After, plaintiff's counsel requested that the jury see more than one photograph, but that request was denied.

Prior to distributing the jury questionnaire, the judge explained to the jury pool that the photograph was provided to ensure that they could "decide this case based upon the facts and the evidence, not on sympathy." The judge stated that the picture was "not for shock value" but to give them "an idea of . . . what [they would] see during the course of the trial" and "make sure [they] underst[oo]d the question" to be decided.

After providing the potential jurors with an opportunity to review the questionnaire, the judge did not read the voir dire questions to the entire array; rather, as the jurors were called, he questioned each of them individually regarding their responses to each question, referring to the questions by number only. In response to question thirteen, three potential jurors were dismissed after stating that they would be unable to do so. At that point, plaintiff's counsel stated,

> I just think that I'm kind of getting hurt by the fact that people are . . . expressing that they're sympathetic. But I think that really they should be asked if they could follow the law and . . . the facts of the case in spite of their sympathy.
> I mean, it just seems like, "Oh, you're sympathetic, you know, you're gone." You know, . . . I don't think it's been fair to my client.

4

Just, you know, if they're sympathetic . . . they should be pressed more on whether they can follow the law[.]

The judge agreed to "expound a little bit more" and evaluate "on a person-by-person basis," but he noted that those who had expressed sympathy thus far were "pretty adamant."

Subsequently, two additional potential jurors were excused due to their response to question thirteen. The first excused juror explained that his younger cousin had died. As to the second, the judge followed up, inquiring whether she "[w]ould . . . be able to render a verdict in favor of the plaintiff or defendant regardless of sympathy." The potential juror responded that she works with children on a regular basis, and it would be difficult for her to set aside her sympathy. After that response, she was dismissed.

On September 27, 2018, the jury returned a verdict in favor of defendants. This appeal followed.

On appeal, plaintiff presents the following issues for our review:

> POINT I: BY FAILING TO ORALLY ASK JUROR QUESTIONS THE TRIAL COURT FAILED TO PROPERLY ASSESS JUROR BIAS, ATTITUDES AND REASONING ABILITY, RESULTING IN BIASED JUROR SELECTION (not raised below)

> POINT II: THE TRIAL COURT ERRED IN DESCRIBING TO THE JURY POOL AND

SUBSEQUENTLY ALLOWING POTENTIAL JURORS TO VIEW EMOTIONALLY CHARGED PHOTOGRAPHIC EVIDENCE BECAUSE IT TAINTED THE JURY SELECTION PROCESS AND BIASED IT IN FAVOR OF DEFENDANTS (not raised below)

POINT III: THE COURT ERRED IN CONDUCTING INQUIRIES AND ALLOWING JURORS TO ANSWER QUESTIONS AND EXPRESS BIASES IN OPEN COURT RATHER THAN AT SIDE-BAR THEREBY TAINTING THE ENTIRE JURY POOL AND RESULTING IN AN UNFAIR JURY SELECTION PROCESS (not raised below)

POINT IV: PURSUANT TO RULE 2:10-2, THE JURY VERDICT SHOULD BE REVERSED IN THE INTEREST OF JUSTICE BECAUSE CUMULATIVE ERRORS OF THE TRIAL COURT WERE CLEARLY CAPABLE OF PRODUCING AN UNJUST RESULT (not raised below)

Plaintiff first argues that the trial judge committed reversible error by failing to orally ask potential jurors, individually, each standard question on the juror questionnaire. Plaintiff contends that this error violated the Administrative Office of the Courts (AOC) Directive #21-06 and mandates reversal. Further, plaintiff contends that this error resulted in the judge's failure to properly assess potential jurors' biases, attitudes, and reasoning ability. We disagree.

As plaintiff correctly notes, AOC Directive #21-06 previously required trial judges to read each voir dire question to each individual juror. See State v.

<u>Morales</u>, 390 N.J. Super. 470, 474 (App. Div. 2007) (holding that written questions "may not serve as a substitute for orally asking questions to each juror" and requiring strict compliance with the Directive). On May 16, 2007, however, the AOC issued Directive #4-07(3), which supplemented and modified AOC Directive #21-06 and states that "[w]here this Directive modifies voir dire procedures set forth in Directive #21-06, it supersedes the relevant portion of that Directive."[1]

Directive #4-07, modified and partially superseded Directive #21-06. Specifically, "[t]he first modification authorizes judges, as an alternative procedure, to conduct voir dire without being required to verbally ask each question to each juror." Consequently, as of the date of plaintiff's trial, there was no requirement that judges orally read each question to each juror.

_____

[1] As the Directive notes, after the implementation of Directive #21-06, the OAC received critical comments from trial judges concerning the procedures in Directive #21-06, focused specifically on the requirement that each question must be verbally put to each prospective juror. In response, the Supreme Court Committee on Jury Selection in Criminal and Civil Trials considered the matter and agreed that requiring each prospective juror to be verbally asked each question was "unnecessary and, to some extent, counterproductive to the goals of the jury selection standards."

That said, the trial judge deviated from the alternative procedures set forth in Directive #4-07 because he failed to read the questionnaire aloud to the entire array. Specifically, Directive #4-07(3) states,

> The judge must read and review each question en banc with the first jurors seated in the box. The judge should instruct all jurors in the array to pay close attention and may tell them to mark their printed copy of the questions with their yes or no responses. The judge should instruct that, unless requested by a particular juror, the questions will not be read again, thus making this the appropriate opportunity for jurors to note their answers. The judge should also instruct that if a juror is unsure of his or her answer or is uncertain as to the meaning of the question, the juror should bring that to the judge's attention when called upon. Jurors will not place their names on the printed copies, and when a juror has completed the process, the printed copy will be returned to court staff and destroyed if written upon or damaged.

Despite this error, we conclude that the judge's failure to read the standard questions to the entire array, as required by AOC Directive #4-07, was not in and of itself reversible error. There appears to have been no objection to the voir dire procedure used, either contemporaneously or after the verdict.[2] To the extent that the purpose of the Directive is to empanel a jury without bias,

---

[2] We do not mean, in any way, to detract from the importance of following proper voir dire protocol, as provided in AOC Directives #21-06 and #4-07. See Morales, 390 N.J. Super. at 472–73.

prejudice, or unfairness, see Morales, 390 N.J. Super. at 475, our review of the record does not suggest that a "miscarriage of justice" resulted from failing to follow those requirements, R. 2:10-1. In that regard, while the specific questions were not read verbatim, the procedure the judge followed included individual questioning of each juror concerning their impartiality.

We also reject plaintiff's argument that the judge erred in allowing the jury pool to view "emotionally[]charged photographic evidence" of the decedent in critical condition in the ICU because it "tainted the jury selection process and biased the . . . process in favor of defendants." Plaintiff initially objected to showing the photograph but on the record requested that more photographs be displayed. Although we question why photographs or other evidence should ever be shown to an array during voir dire, only two excused jurors mentioned the photograph as a reason they could not be impartial; the remaining excused jurors had more general reasons, including the loss of a young relative or their work with young children. Moreover, in requesting that additional photographs be displayed, plaintiff's counsel evidently recognized that the photograph was capable of invoking sympathy to his client's benefit.

We also reject as unfounded plaintiff's attempt to link the photograph to the absence of any parents on the jury. In that regard, plaintiff asserts that

9

"children are members of a cognizable group . . . and parents are an important cross-section of society deserving of representation as jurors." Plaintiff argues that the display of the photograph "could have resulted in a selection of jurors who were actually biased against children."

As a threshold matter, in any Gilmore[3]-based claim, "a defendant must first identify a constitutionally cognizable group, i.e., a group capable of being singled out for discriminatory treatment." State v. Fuller, 182 N.J. 174, 181 (2004) (quoting State v. Fuller, 356 N.J. Super. 266, 278 (App. Div. 2002)). Our Supreme Court has explained that people who are "demonstrative about their religions" and "age-defined groups" are not such constitutionally cognizable groups, as they "do not 'hold cohesive and consistent values and attitudes . . . [that] are substantially different from other segments of the community.'" Ibid. (alteration in original) (quoting Fuller, 356 N.J. Super. at 279). Similarly, here, parents are not a constitutionally cognizable group, and their unintentional exclusion from the jury was not discriminatory.

More importantly, there was no systematic exclusion of jurors with children in this case. Of the eight first-seated jurors, none had children. Many,

---

[3] State v. Gilmore, 199 N.J. Super. 389 (App. Div. 1985), aff'd, 103 N.J. 508 (1986).

if not most, of the replacement jurors also had no children. Plaintiff happened to drew an array that had an unusually high percentage of people with no children. Thus, even if legally sustainable, the record does not support plaintiff's claim.

We also reject plaintiff's argument that the judge committed plain error by conducting inquiries and allowing prospective jurors to answer questions and express biases and opinions in open court rather than at sidebar, which she alleges tainted the jury pool and resulted in an unfair selection process.

"[L]itigants are entitled to an unbiased jury and to a fair jury selection process." Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 40 (2009). Trial judges have the primary responsibility of "ensur[ing] that the selection of jurors is conducted in a manner that will effectuate these rights." Ibid. In doing so, judges have the discretion to determine whether to question a prospective juror "in open court, while the prospective juror is seated in the jury box, or to conduct the examinations of each of them, or any of them, separately at sidebar." Id. at 41.

Here, plaintiff claims that the judge abused his discretion in allowing the following comments to be made in open court:

> [POTENTIAL JUROR NUMBER FIVE]: I mean, I
> have an opinion. My opinion is that in healthcare they

A-0700-18T2

try their best . . . to do what they can, so . . . that they're not necessarily happy with the result doesn't necessarily mean that . . . (indiscernible).

. . . .

[POTENTIAL JUROR NUMBER EIGHT]: I don't think you can put a price on someone's life.

. . . .

[POTENTIAL JUROR NUMBER EIGHT]: Sometimes I get so emotional . . . . So, when we look at the doctors there, they are people too. Everyone has to make choices. And . . . people make mistakes but then to what extent. Like (indiscernible).

. . . .

[POTENTIAL JUROR NUMBER SEVEN]: [T]hrough my occupation I work in this building regularly and also . . . from my birth until [eighteen] years old, [defendants] were my pediatricians and also my cousin's a nurse for that group as well.

We discern no abuse of discretion in allowing these comments to be made in open court as they were fleeting, and no objections were made at the time. All three potential jurors were excused, numbers five and eight by plaintiff and number seven by the judge.

Pellicer is distinguishable from the instant case, as it involved prospective jurors who "voice[d] deep feelings of resentment and bias in open court." 200 N.J. at 45. These included specific, emotionally charged examples of the poor

care and "negative experiences" that the potential jurors' relatives received at the defendant hospital, which were characterized as "repeated expressions of anger, resentment, bitterness, and dissatisfaction . . . directed at the very facility where the tragic events that were about to be considered had taken place[ and] could not have been ignored by the jurors who overheard them." Id. at 45-47. Here, by contrast, the statements that plaintiff points out express only general opinions regarding the medical profession and nonspecific feelings toward defendants. These are neither "deep feelings of bias" that the Supreme Court directed must be expressed at sidebar, id. at 47, nor do they constitute ringing endorsements of defendants or their profession.

In short, none of the cited errors, individually or on a cumulative basis, were clearly capable of producing an unjust result and, as such, we decline to disturb the jury's verdict.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION