219 N.J. Super. 550 (1987)
530 A.2d 1260
IN THE MATTER OF JAMES B. DANIELS, AN ATTORNEY-AT-LAW OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 1987.
Decided July 30, 1987.
*554 Before Judges MICHELS, O'BRIEN and SKILLMAN.
Louis S. Raveson, Assistant Public Advocate, argued the cause for appellant James B. Daniels (Alfred A. Slocum, Public Advocate, attorney; Louis S. Raveson and Lance D. Cassak, Assistant Deputy Public Advocate, of counsel and on the brief).
Richard W. Berg, Deputy Attorney General, argued the cause for respondent The Superior Court of New Jersey, State of New Jersey (W. Cary Edwards, Attorney General of New Jersey, attorney; Richard W. Berg, of counsel and on the brief).
Poplar & Florio submitted a brief on behalf of amicus curiae Trial Attorneys of New Jersey (Carl D. Poplar, of counsel and on the brief).
Ruhnke & Barrett submitted a brief on behalf of amicus curiae The Association of Criminal Defense Lawyers of New Jersey (David A. Ruhnke, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
On March 19, 1986, following a summary hearing, the Honorable Alfred J. Lechner, Jr. found defendant James B. Daniels, an attorney-at-law of the State of New Jersey, guilty of contempt in the presence of the court, sentenced him to two days in *555 the Union County Jail and fined him $500. Defendant appealed.
The events giving rise to the contempt conviction occurred during defendant's representation of Michael McMahon, whose trial for first degree robbery commenced on March 18, 1986. Defendant was employed by the Union County Region of the Office of the Public Defender and assigned as trial counsel for McMahon. Although defendant was held in contempt on March 19, 1986, the second day of pretrial hearings, a review of the proceedings on both March 18 and 19, 1986 and of certain events leading up to trial is necessary to establish the context in which the allegedly contemptuous behavior occurred.
On January 14, 1986, Investigator John Stanton, an expert polygraphist in the Public Defender's Office, administered a polygraph examination to McMahon. Stanton informed defendant that McMahon passed the test "with flying colors," and, that in the ten years in which he had been involved in polygraph testing, no one who passed so convincingly had ever failed a subsequent examination. Based upon this assessment, defendant contacted the Prosecutor's Office to see if they would be willing to allow McMahon to take their polygraph test on a stipulated basis. Initially, the State was not amenable to this request; however, after persisting for several weeks and filing a formal motion to attempt to compel the State to give a stipulated polygraph, defendant was able to convince the State to allow McMahon to be tested. Thus, knowingly, voluntarily and, at all times represented by counsel, McMahon entered into an agreement with the State which provided, among other things, that: (1) irrespective of the outcome, the results of the polygraph test to be administered by Investigator Peter Brannon, a polygraph expert employed by the State, would be admissible on behalf of either side; (2) the results of any other polygraph examination would not be admissible unless covered by a separate stipulation, and (3) although the opposing party [McMahon] could cross-examine Brannon as to his personal qualifications or the details of the test which he administered, *556 McMahon could not introduce another polygraphist to refute Brannon's expert testimony.
After conducting an examination, Brannon concluded that McMahon was not telling the truth when he denied his involvement in the robbery with which he was charged. Brannon and Stanton then compared the tests that each had administered to McMahon. Although reaching opposite results concerning McMahon's complicity in the crime, they had used virtually identical equipment and questions, and both tests were conducted properly. Neither polygrapher could explain the divergence in the results.
At the March 18, 1986 hearing, the trial court heard argument on the defense motion to have the State's polygraph evidence excluded or, alternatively, to permit the results of Investigator Stanton's test to be admitted into evidence. Preliminarily, defendant requested a Rule 8 hearing so that the trial court might reconsider the reliability of polygraph results in light of the information which had become available since the Supreme Court's decision in State v. McDavitt, 62 N.J. 36 (1972). Defendant maintained that the plethora of research since McDavitt has established the unreliability of polygraph examinations. In support of his position, defendant presented certain literature and was prepared to offer the testimony of Dr. Leonard Saxe, a Boston University professor who authored a 1983 congressionally commissioned study which concluded that there was no scientific basis for the validity or use of the polygraph test. Nonetheless, the trial court denied the defense request for a Rule 8 hearing. Because McDavitt established that "polygraph results are admissible if they are the subject of a knowing, voluntary, unequivocal and reciprocal stipulation" and in the instant case the parties had such a stipulation, the trial court concluded that a Rule 8 hearing would serve no purpose.
Defendant proceeded to argue that enforcement of certain provisions of the stipulation would be violative of due process, *557 public policy and principles of fundamental fairness. The thrust of defendant's argument was that precluding the defense from introducing the results of the first polygraph test through its own expert would serve no legitimate purpose and would conceal half the story from the jury. Given the overriding concern with the search for truth, defendant maintained that the trial court should repudiate those provisions of the stipulation which would result in a distortion of the evidence presented to the jury. After allowing a lengthy argument by defendant and the State's response thereto, the trial court explained in detail that the stipulation met the requirements of McDavitt, constituted a knowing and intelligent waiver of McMahon's Sixth Amendment rights to present evidence and expert testimony, and would therefore be enforced in its entirety in the interests of justice.
After the trial court rendered its decision, defendant inquired whether, in cross-examining the State's polygraphist, he would "be permitted to read the stipulation in its entirety, making reference to the fact [that] he [Brannon] was aware that another test had been conducted." The trial court denied defendant's request and specifically ordered him not to refer directly or indirectly to the other polygraph examination. Defendant's attempt to pursue the matter further precipitated the following exchange:
THE COURT: I don't want to hear any further argument on it. I will not permit further argument on it. I gave you your chance earlier. It's over.
MR. DANIELS: I have not been able to argue this point.
THE COURT: I'm sorry. I asked you any other point on the stipulation. You said no. No further argument.
MR. DANIELS: Judge 
THE COURT: Mr. Daniels, did you hear me?
MR. DANIELS: Yes, sir, I must insist 
THE COURT: You will not get it.
MR. DANIELS: I have not been given an opportunity to argue this.
THE COURT: You will not get this.
MR. DANIELS: I must have misunderstood the Court with reference to 
THE COURT: We've been doing this for two hours. This hearing is over.
*558 Furthermore, the trial court denied defendant's application to stay the proceedings to allow for an interlocutory appeal of the ruling.
Later in the same proceedings, defendant argued that, by its terms, the parties' stipulation would allow him to question the State's polygraphist about the "critics of [the] polygraph and their concerns about [the] unreliability and invalidity of the test in general." To this end, defendant presented to the trial court numerous articles on the polygraph and requested, pursuant to Evid.R. 9(2)(e), that the court take judicial notice of those articles. Due to the controversy surrounding the reliability of the polygraph, the trial court opined that the writings were not the proper subject of judicial notice. However, the trial court agreed with the prosecutor that defendant could use these articles to cross-examine the State's expert if he recognized them as treatises or authorities in the field. Defendant presented additional argument on the matter which the trial court agreed to consider over the lunch recess. However, upon reconvening the hearing, the trial court ruled that it would not take judicial notice of the articles.
Defendant requested to be heard on that ruling, and the trial court afforded him five minutes to present his views. After defendant argued why he believed the articles on the polygraph satisfied the requirements of Evid. R. 9(2)(e), the following colloquy took place:
THE COURT: So what? So what on all of this?
MR. DANIELS: So what, Judge?
THE COURT: That's exactly what I said. So what?
MR. DANIELS: There couldn't be anything more important. I have been denied the opportunity to bring in my experts to talk about this.
THE COURT: No, you haven't been denied. You went into a stipulation agreeing not to do that. You weren't denied anything.
MR. DANIELS: I am denied that. Okay? The Court has ruled. I have said in spite of my stipulation I have asked to do this and the Court refused to allow me to.
THE COURT: The answer is no, unequivocally, unalterably, no.
Anything else on this point?
MR. DANIELS: I just want to make sure I understand the Court's ruling.

*559 THE COURT: Oh, stop. Don't posture with me. Anything else on this point?
MR. DANIELS: No.
After the trial court reiterated that it would not take judicial notice of the articles and that defendant could refer to them only if the State's polygrapher recognized them as treatises, the trial court and defendant addressed one another in the following manner:
THE COURT: Mr. Daniels, I frankly don't care about your response but if you continue to do that, sir, I'm going to take appropriate action.
MR. DANIELS: Your Honor, go right ahead, take whatever appropriate action your Honor deems necessary.
THE COURT: For the record, Mr. Daniels, you're sitting there shaking your head, smiling and being disrespectful. I'm telling you right now, you are close to the edge, sir. I frankly do not care what you think about my rulings. Should you manifest it outwardly in this courtroom, I shall hold you in contempt and I shall put you in the County Jail. Thereafter I will adjourn the trial until you come out.
I am giving you fair warning. I will not put up with your antics. I do no want to hear a word from you again. When I say the argument is over you will sit down and be quiet. Do you understand me?
MR. DANIELS: You could not be clearer.
THE COURT: Be guided accordingly.
A recess ensued, after which defendant stated to the trial court:
I would just like to say that although clearly I was disappointed with the Court's ruling, I meant no disrespect to the Court. It was a very human response, I shook my head. I apologize. I meant no disrespect.
The trial court replied that they should "[p]ut it behind [them] and forget about it."
Following a Wade hearing, which was decided against McMahon, a jury was selected on March 19, 1986. After counsel for both sides had stated that the jury was satisfactory, but before the jurors were sworn, defendant moved for a mistrial based on the principles espoused in State v. Gilmore, 199 N.J. Super. 389 (App.Div. 1985), aff'd 103 N.J. 508 (1986). In support of the motion, defendant maintained that four of the eight peremptory challenges exercised by the State were used to exclude black women. The State, however, argued that all four black women had relatives or close friends who had committed or were victims of crimes, including murder. Therefore, the State was *560 of the opinion that, despite their assertions to the contrary, these witnesses might have formed an opinion as to the criminal justice system. In rendering its decision, the trial court noted preliminarily that one of the four requirements under Gilmore is that there be a timely motion  one made prior to swearing the jury. Although not satisfied that this requirement had been met, the trial court began to rule upon the motion on the assumption that it was timely. However, the trial court stopped itself in mid-sentence and directed defendant to stand. The following then transpired:
MR. DANIELS: Yes, sir.
THE COURT: Put on the record right now, you laughed, you rolled your head, you threw yourself back in your seat.
MR. DANIELS: Judge, I didn't, I did neither of those things, none of them, zero. And I'm tired of this kind of stuff.
THE COURT: I find you in contempt of court. You'll be able to respond right now. I declare that this jury will be released.
I find that in accordance with State v. Vasky [203 N.J. Super. 91], decided June 24, 1985, Appellate number 2291-84-T5, the following: "A `contempt' of court is a disobedience of the Court by acting in opposition to its authority, justice and dignity. It comprehends any act which is calculated to or tends to embarrass, hinder, impede, frustrate or obstruct the Court in the administration ofjustice or which is calculated to or has the effect of lessening its authority or dignity; or which interferes with or prejudice[s] parties during the course of the litigation, or which tends otherwise to bring the authorities or administration of the law and [sic] into disrepute or disregard. In short, any conduct is contempt[i]ble which bespeaks off [sic] scorn or dis[d]ain for the authority of a Court or its authority in general.
"Even when a person commits contempt which directly insults the Court," in connection with such activity. [sic]
Now I will accord you an opportunity to show that you did not possess at the time the requisite mens rea but this will be done at a summary hearing immediately.
I find that I warned you yesterday about your conduct in sitting in your seat, laughing, holding your head down and besmirching what is going on in this court. I find you in contempt.
You may be heard before I pass sentence.
I find you're laughing and smiling again.
MR. DANIELS: Judge, I'm a human being. I respond. I have shown no disrespect. I cannot help but be a human being.
I have been in this courtroom now since Tuesday. Every single decision has gone against me. The Court has stood there and in my opinion, most respectfully, *561 has done nothing other than act as a second Prosecutor throughout these proceedings.
I have not at any time shown any disrespect to the Court. I have reacted like a human being. I was disappointed with the Court's responses, with the Court's decisions during the course of these proceedings. My response to it was not yelling and screaming, not raising my voice, not screwing up my face, not jumping up and down, not showing any disrespect to any member of this courtroom, of this staff or to your Honor.
I and [sic] a human being. I was disappointed. I sat back in my chair as I have been sitting back in my chair and I lowered my head and I robbed [sic] my eyes. That is all that I did.
I think that if we put on anybody in this courtroom right now that they would testify that I did nothing that was disrespectful to the Court. I did nothing other than sit back in my chair, put my head down and cover my eyes when the Court ruled that the objection to this case was not  the objection in the Gilmore application was an application that was not timely made. The language could not be clearer. It must be done before the jury is sworn.
The application was made before the jury was sworn. The Court, in my view, was bending over backwards to find a way not to even hear the motion, although the motion was timely made.
THE COURT: Don't raise your voice.
MR. DANIELS: I'm sorry. I am obviously human and angry. I'm trying to show the most respect that I can for this Court.
I did not engage in any conduct which by any stretch of the imagination can be deemed co[n]temptuous.
Your Honor and I have had disagreements. We will continue to have disagreements. That's the nature of the game. I am sorry that I don't sit here and thank the Court every time it rules against me. I am sorry that I don't sit here and thank the Court when it sends my client to prison. I don't see that as being my job, my responsibility or my function in this courtroom. My job, my function, my responsibility is to be the best advocate that I can for my client and I am going to do the damnedest to try to do that.
The situations which your Honor has made reference to have been situations  all of which have been outside the presence of the jury. I have not shown anything other than the most, utmost respect for the Court, for the system, for the entire process.
THE COURT: Do you wish to say anything further?
MR. DANIELS: No.
THE COURT: Do you wish to call any witnesses?
MR. DANIELS: May I have a few moments, your Honor?
THE COURT: Respond now. Do you wish to call any witnesses of [sic] anybody who saw what you did?
MR. DANIELS: I would like to consult with an attorney.
THE COURT: Summary hearing right now. Do you want to call a witness?
MR. DANIELS: No.

*562 THE COURT: All right. I find that you sat there and laughed. I find that response in the best light is disingenuous. I saw you sit back there and laugh.
I didn't even get a chance to put my full opinion on the record. I told you there were four criteria under Gilmore. I indicated to you that I didn't think it was a timely objection but even assuming that it were, and giving you the benefit of the doubt, I was trying to go on to B, C and D. You interrupted by your contemptuous conduct.
I find you in contempt of Court and I sentence you to two days in the County Jail and a $500 fine, which will be carried out immediately.
I will discharge the jury before we have this carried out.
Thereupon, the trial court discharged the jury and ordered that defendant be taken to the county jail.
Because the order of contempt presented for the trial court's signature on March 19, 1986 did not contain all the information required by R. 1:10-1, and, at that time, there was no secretarial assistance available to make additions to the order, Judge Lechner entered a supplemental order on March 24, 1986. This order described defendant's conduct on March 18, 1986 as "expressions of disrespect," including "shaking his head, laughing, and rolling his eyes and head to express his disapproval and scorn." Moreover, the order provided that when asked if he understood the trial court's warning that a repetition of such conduct would lead to a citation for contempt and his being incarcerated, defendant "sarcastically responded that `[y]ou [the court] could not be clearer.'" Judge Lechner further stated in the order that defendant's disrespect was also manifest in his reply  "`[y]our Honor, go right ahead, take whatever appropriate actions your Honor deems necessary.'"  to another admonition by the court. According to Judge Lechner, the "inflection of voice and sarcastic manner of delivery [of this statement] verbally confirmed the disrespect of Mr. Daniels evidenced just a few minutes earlier." Rather than responding to defendant's "dare," Judge Lechner averred that he tried to "defuse the situation." Subsequently, defendant apologized for his conduct.
Recounting the incidents of March 19, 1986, the order noted that when Judge Lechner was deciding the Gilmore motion, defendant "again reacted with seriously offensive and contemptuous *563 conduct." On that occasion, defendant laughed, threw himself back into his chair, shook his head and covered his eyes. As a consequence, defendant was cited for contempt of court. Although acknowledging that Judge Lechner had stated several times that he "finds defendant in contempt," the order explained that these expressions were "in effect a notification or charge of contempt of court. Mr. Daniels was not held in contempt ... until after he was given an opportunity to be heard with regard to his mens rea and sentencing." Defendant was afforded this opportunity, albeit at a summary hearing.
Defendant's response to the charge of contempt was characterized in the order as a "tirade." In fact, it was once necessary for the trial court to direct defendant to lower his voice. Although defendant apologized, he thereafter offended the trial court by stating in a disrespectful manner, "`I'm trying to show the most respect that I can for this court' ... (emphasis as stated)." Moreover, in a contemptuous voice, defendant accused the court of being a second prosecutor. Admitting to conduct which he had previously denied, defendant attributed his actions to being "human." As indicated in the order, the trial court found defendant's attempt to prove a lack of mens rea disingenuous.
Additionally, the order noted that although defendant maintained that anyone in the courtroom would confirm that he had done nothing disrespectful to the trial court, defendant refused to call any witnesses when given the opportunity to do so. According to Judge Lechner, this failure to call witnesses confirmed that no one could corroborate defendant's protestations of innocence. Defendant's conduct was willful, deliberate and disruptive and his comments "had the effect of lessening the dignity of the court." Finding defendant's conduct to be "an open threat to the orderly procedure of the Court," Judge Lechner concluded that the "[i]mposition of a custodial sentence was required."
*564 The order further stated that, although the record is silent in this regard, the trial court did in fact consider aggravating and mitigating factors before passing sentence. Although defendant did not address his comments to sentencing, the trial court assumed that all mitigating factors applied to him. Nonetheless, it concluded that the two aggravating factors "qualitatively outweighed all mitigating factors." The aggravating factors mentioned in the order were defendant's conduct and the need to deter him from similar actions in the future. Thus, "it was a balancing of the quality of [the] factors which required the imposition of incarceration."
Finally, Judge Lechner noted in the order that on two separate occasions on March 19, 1986, a representative from the Office of the Public Defender came to see him in his chambers on behalf of defendant. Judge Lechner stated that he would vacate the jail sentence and reduce the fine if defendant would apologize. However, when these offers were conveyed to him, defendant indicated that he was not interested in apologizing.
Having been granted leave of court, defendant supplemented the record with his affidavit of May 1, 1986. In his affidavit, defendant recounted a conversation he had with Thomas P. Simon, Esq., the prosecutor representing the State in State v. McMahon. According to defendant, Simon had stated that although he saw defendant smiling and shaking his head disapprovingly, he did not hear defendant utter a sound prior to being held in contempt. The affidavit further indicates that Simon described defendant as having vigorously defended his position as many attorneys had done in the past. Likewise, the affidavit states that Judy Kollarik, the official court reporter assigned to Judge Lechner's courtroom on March 19, 1986, did not hear defendant say a word even though she was seated just a few feet from him. Defendant's affidavit states that Ms. Kollarik did see defendant lean back in his chair, put his hand to his forehead and shake his head in disagreement when the trial court began to rule against him on the Gilmore application.
*565 The record was also supplemented with the April 29, 1986 affidavit of James Tighe, the clerk assigned to Judge Lechner's courtroom at the time of the events in question. Although sitting just a few feet from defendant, Tighe stated that he did not hear defendant say anything prior to being held in contempt. Moreover, Tighe averred that when given an opportunity to be heard, defendant vigorously defended his position without being sarcastic or disrespectful in his manner or tone of voice.
The final affidavit supplementing the record was that of Assistant Prosecutor Simon dated June 2, 1986. Simon recounted how, on March 18, 1986, Judge Lechner stopped the proceedings to admonish defendant for being disrespectful and to warn him that any further actions of that nature would result in his being found in contempt. Simon stated that during the Gilmore motion on March 19, 1986, he observed defendant sitting "in his chair, waving his hands, shaking his head, and making laughing gestures." Simon was not able to hear any laughter; however, he noted that audibility in the courtroom was poor because several windows were open and it was quite windy. According to Simon, when Judge Lechner accused defendant of repeating his conduct of the previous day, defendant "jumped out of his seat, waved his hand at the Court, and said he was doing none of those things, and he was tired of this kind of `stuff.'" A confrontation in which defendant accused the trial court of being a second prosecutor culminated in defendant being found in contempt.
Furthermore, Simon asserted that by taking his statements out of context, defendant's affidavit distorted the meaning of what Simon had said to defendant. Simon stated that he had told defendant that defendant was initially being confrontational with the judge, and that, after defendant calmed down, he argued his point vigorously. Simon opined that by omitting the first part of his comment, defendant's affidavit altered the meaning of what he had said.
*566 Defendant seeks a reversal of his contempt conviction or, alternatively, a reversal and a remand for a hearing pursuant to R. 1:10-2. He seeks this relief on the following grounds set forth in his brief:
POINT I APPELLANT'S CONDUCT DID NOT CONSTITUTE CONTEMPT AS A MATTER OF LAW.
A. The Tension Between The Independence Of The Bar And The Contempt Power.
B. Appellant's Gestures And Physical Reaction To The Trial Judge's Rulings Did Not Disrupt Or Obstruct The Proceedings And Were Not So Flagrant As To Constitute Contempt.
1. The Requirement Of A Material Disruption.
2. Appellant's Conduct Did Not Rise To The Level Of Contempt, Nor Did It Cause A Material Disruption In The Proceedings.
C. Appellant Lacked The Necessary Mens Rea To Support The Conviction For Contempt.
POINT II UNDER THE CIRCUMSTANCES OF THIS CASE, THE COURT IMPROPERLY EMPLOYED SUMMARY PROCEDURES AND SHOULD HAVE ALLOWED APPELLANT A FULL HEARING ON THE CHARGE OF CONTEMPT.
A. Summary Procedures Are Disfavored And Are To Be Used Only When Time Is Of The Essence.
B. Even Where Time Is Of The Essence, Other Circumstances In This Case Call For The Use Of R. 1:10-2 Procedures.
1. Because The Allegedly Contemptuous Behavior Constituted An Attack On The Judge's Rulings, The Contempt Charge Should Have Been Heard Pursuant To R. 1:10-2.
2. Summary Procedures Should Not Be Used Where Vital Evidence Can Be Provided By Persons Other Than The Judge.
3. Because The Trial Court Imposed A Sentence Of Incarceration, This Matter Should Have Been Heard Pursuant To R. 1:10-2.
D. Conclusion: The Use Of The Least Restrictive Alternative.
POINT III EVEN IF SUMMARY PROCEDURES UNDER R. 1:10-1 WERE PROPER, THE CONTEMPT ADJUDICATION WAS MARKED BY A NUMBER OF PROCEDURAL IRREGULARITIES THAT UNCONSTITUTIONALLY DENIED APPELLANT DUE PROCESS.
A. The Trial Judge Should Have Recused Himself And The Charge Of Contempt Should Have Been Heard By A Different Judge.
B. The Judge Denied Appellant His Right To Be Heard Prior To Finding Him In Contempt.
C. The Judge's Refusal To Allow Appellant To Consult With An Attorney Violated His Rights Under The United States And New Jersey Constitutions.
POINT IV EVEN IF APPELLANT'S CONDUCT CONSTITUTED CONTEMPT, THIS MATTER MUST BE REMANDED FOR A HEARING AS TO THE APPROPRIATENESS OF THE SENTENCE.
*567 Our duty on an appeal of a summary conviction for contempt is to try the matter de novo on the trial record, upon the law and the facts, towards the end of adjudicating both guilt and punishment. N.J.S.A. 2A:10-3 and R. 2:10-4. In re Yengo, 84 N.J. 111, 135 (1980), cert. den. 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981); In re Spann Contempt, 183 N.J. Super. 62, 65 (App.Div. 1982); In re Parsippany-Troy Hills Ed. Ass'n, 140 N.J. Super. 354, 360 (App.Div. 1975); In re Ed. Ass'n of Passaic, Inc., 117 N.J. Super. 255, 259 (App.Div. 1971), certif. den. 60 N.J. 198 (1972); Bd. of Ed. of Newark v. Newark Teachers Union, 114 N.J. Super. 306, 318 (App.Div. 1971), certif. den. 58 N.J. 605 (1971), cert. den. 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). "The only limitation on our power, beyond that applicable to the trial court, is that we may not impose a greater sentence than that which the trial court imposed." State v. Vasky, 203 N.J. Super. 91, 99 (App.Div. 1985); Parsippany-Troy Hills Ed. Ass'n, supra, 140 N.J. Super. at 360.
Having studied the entire record in light of this obligation, we are in accord with the trial court's factual findings and legal conclusions and adopt them as our own. We find beyond a reasonable doubt that defendant's conduct constituted contempt in the presence of the court. In reaching this conclusion, we have considered the contentions set out above and all the arguments advanced by defendant in support thereof and find that, with the sole exception of the issue of punishment, they are clearly without merit. R. 2:11-3(e)(2). Further comment, however, is appropriate with respect to some of the issues raised.

I.

THE PROPRIETY OF THE SUMMARY CONTEMPT PROCEEDINGS UNDER R. 1:10-1
Defendant argues that resort to summary procedures under R. 1:10-1 was inappropriate. Alleging that the jury had been *568 released and the trial ended prior to the onset of the contempt proceedings, defendant contends that there was no need for immediate action to insure the continuity of the trial. Since time was not of the essence, defendant maintains that in order to safeguard his due process rights, the trial court should have used the "normal" procedures under R. 1:10-2. Defendant also challenges the use of a summary hearing on evidentiary grounds. He contends that his "good faith" explanation for his actions and the existence of factual disputes concerning this conduct necessitated a full hearing at which evidence from persons other than the judge could be adduced. Furthermore, defendant argues that the allegedly contemptuous conduct was a personal attack on the judge who took offense and lost all objectivity. Therefore, the charge of contempt should have been heard by another judge. Additionally, defendant asserts that because he was sentenced to imprisonment and because summary proceedings diminish one's due process rights, a balancing of the competing interests dictates that the contempt charge should have been heard pursuant to R. 1:10-2. According to defendant, a R. 1:10-2 hearing is a least restrictive alternative, vis-a-vis the infringement of his constitutional rights, which should have been invoked in this case. Lastly, even if a summary hearing were justified, defendant claims that he was denied the right to be heard and the right to counsel. Consequently, he contends that "the proceeding below was fundamentally unfair and the finding of contempt must be reversed."

A.

Summary Proceedings Pursuant To R. 1:10-1 Were Justified
Defendant's assertion that summary proceedings are appropriate only when time is of the essence is unsupported by New Jersey case law. "Contempt in the actual presence of a judge may be adjudged summarily by the judge without notice *569 or order to show cause." R. 1:10-1; Yengo, supra, 84 N.J. at 121; In re Contempt of Carton, 48 N.J. 9, 21 (1966); Vasky, supra, 203 N.J. Super. at 98; In re Hinsinger, 180 N.J. Super. 491, 495 (App.Div. 1981). The power to punish summarily for contempts committed in the face of the court, "although arbitrary in its nature and liable to abuse, is absolutely essential to the protection of the courts in the discharge of their functions." Ex parte Terry, 128 U.S. 289, 313, 9 S.Ct. 77, 83, 32 L.Ed. 405, 412 (1888). See also In re Contempt of Ungar, 160 N.J. Super. 322, 330 (App.Div. 1978). The need to control the proceedings may compel swift action. See Carton, supra, 48 N.J. at 21. Not only disobedience to orders of the court, but any misbehavior which tends to impede the administration of justice may constitute a contempt. See Sarner v. Sarner, 28 N.J. 519, 524 (1959), app. dism. and cert. den. 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028 (1959). This includes conduct of an attorney which tends to obstruct justice. See In re Logan, Jr., 52 N.J. 475 (1968). However, since the power to punish directly inevitably diminishes the procedural due process accorded the alleged contemnor, the power must be permitted only where necessary. See Harris v. United States, 382 U.S. 162, 165, 86 S.Ct. 352, 354, 15 L.Ed.2d 240, 242 (1965). See also Yengo, supra, 84 N.J. at 122.
In Yengo, for example, the attorney Yengo was held in contempt for taking a trip to Bermuda during a complex gambling conspiracy trial in which his client was one of numerous defendants. Although Yengo had briefed one of his colleagues to proceed in his stead, Yengo's client had consented to this substitution of attorney and the trial proceeded as scheduled, Yengo was summarily found guilty of contempt and fined $500 upon returning from Bermuda. We reversed and remanded, holding that Yengo's conduct constituted an indirect contempt requiring notice and hearing pursuant to R. 1:10-2 and R. 1:10-4. In re Yengo, 167 N.J. Super. 66, 70 (App.Div. 1979). However, the Supreme Court disagreed. Finding that Yengo's unexcused absence and frivolous explanation therefor was a *570 direct contempt, the Court reinstated the summary contempt conviction and $500 fine. Thus, despite the absence of any urgency for an expedited hearing, the trial court's resort to summary proceedings was upheld by our Supreme Court.
Likewise, in Hinsinger, supra, defendant was cited for contempt for refusing to testify despite the trial court's instruction that he do so. Six days later, at a summary hearing conducted pursuant to R. 1:10-1, defendant was found guilty of contempt and sentenced to a six-month term in county jail. Although the need for immediate action due to defendant's refusal to testify had passed long before defendant's contempt hearing, we upheld the trial court's use of summary procedures. Hinsinger, like Yengo, refutes defendant's argument that, because time was not of the essence, the trial court erred in summarily trying him for contempt.
Defendant also claims that there was a factual dispute as to the nature of his conduct and that the resolution of this controversy required a plenary hearing at which additional, crucial evidence could have been presented. To support his assertion that a dispute existed, defendant points to the purported discrepancies between the transcript of the proceedings and the trial court's "embellished" supplemental order. Similarly, defendant maintains that the trial court's account of what transpired conflicts with the recollection of others who were present in the courtroom. Because of these alleged inconsistencies and the fact that defendant's conduct consisted largely of silent, physical gestures, defendant argues that a R. 1:10-2 hearing was necessary to elicit more testimony. Finally, defendant contends that his good faith explanation  that his actions were merely a human response  was another reason why a summary proceeding was improper.
Neither the facts of this case nor the law of contempt support the arguments advanced by defendant. Contrary to what defendant avers, there are no discrepancies between the trial transcript and the supplemental order of contempt. On March *571 18, 1986, the trial court noted that defendant was "sitting there shaking [his] head, smiling and being disrespectful." Likewise, on March 19, 1986, the trial court stated for the record that defendant "laughed ... rolled [his] head [and] threw [himself] back in [his] seat." Immediately before defendant was given an opportunity to be heard, the trial court found that he was "laughing and smiling again." Although the supplemental order of March 24, 1986 is more detailed and frequently characterizes defendant's conduct and the manner in which he addressed the trial court as contemptuous, sarcastic and disrespectful, it does not conflict in any material respect with the transcript of the proceedings. Likewise, the affidavits of Tighe, Simon and Daniels basically accord with the events as recited in the supplemental order. The affidavits corroborate the trial court's description of defendant's actions and facial expressions; however, none of the affiants actually heard defendant laugh. Whether this fact is attributable to the difficulty in hearing caused by the open courtroom window or the quietness of defendant's laughing gestures does not impact significantly on the outcome of this case. It merely suggests that if defendant's conduct was contumacious, it was not so because of its audibility. Thus, there was no dispute necessitating a full hearing at which testimony could be taken.
Moreover, where, as here, the contumacious conduct occurred entirely in the trial court's presence and calling witnesses would not bring to light any information beyond that which the judge had himself perceived, no purpose would be served by conducting a plenary hearing. As we stated in State v. Gonzalez, 134 N.J. Super. 472, 477 (App.Div. 1975), aff'd as modified 69 N.J. 397 (1975):
All the conditions which justify summary convictions for contempt during a trial were present here. Defendant's contemptuous conduct occurred in open court and was directly witnessed by the judge. Immediate treatment was necessary to preserve order and a deliberate atmosphere in the courtroom.
Although conceding that "defendant's alleged contempt was in the presence of the court and thus was subject to summary *572 adjudication by the trial judge pursuant to R. 1:10-1," (at 592), our dissenting colleague concludes that certain ambiguities in the record warrant remanding this matter for an evidentiary hearing. In our view, such an approach is inconsistent and would unjustifiably undercut the summary power of contempt. Here, the trial court was exposed to all of the conduct and language which resulted in the contempt citation and, therefore, was expressly authorized to try defendant summarily. In doing so, the trial court accorded defendant a right of allocution and an opportunity to call witnesses. Defendant declined to call any witnesses on his behalf; however, he later supplemented the record with his affidavit and that of one other observer. After carefully considering these affidavits and the one submitted by Assistant Prosecutor Simon, we cannot conclude that there was a conflict, the resolution of which required additional testimony. Moreover, even if, contrary to our conclusion, further testimony should have been elicited, the time for doing so was at the summary hearing. By choosing instead to rely upon the affidavits, defendant cannot transform the nature of his actions into that of an indirect contempt and thereby secure a plenary hearing to which he was not entitled.
Additionally, defendant's argument that his good faith explanation warranted proceeding by order to show cause was considered and rejected by this court in Hinsinger, supra. There, a psychiatrist testifying on defendant's behalf at the summary contempt hearing opined that defendant's refusal to testify was attributable to "a `factitious disorder' producing his mutism predicated on a clear underlying mental disorder." 180 N.J. Super. at 494. Relying upon Yengo, defendant in Hinsinger contended that since an adequate explanation was offered for his conduct, the matter should have been tried by a different judge at a full hearing.
In Hinsinger, we observed that Yengo does not stand for the proposition that whenever a legitimate explanation is offered a direct contempt becomes indirect and thus inappropriate for summary proceedings. We noted that in Yengo, the Supreme *573 Court focused exclusively on whether an attorney's absence from court constituted a direct or indirect contempt. Explaining that a crucial element of that offense was the attorney's explanation which may refer to facts not before the court, the Yengo court held that the adequacy of the explanation would determine how the offense was to be categorized and thus whether summary procedures were justified. Noting that Yengo was inapplicable to that case, in which the contemptuous omission was the witness' refusal to testify which occurred in the trial court's presence, we held that the trial court's resort to summary procedures was proper. Because almost every contempt calls for an explanation, we found that defendant's interpretation of Yengo would vitiate the summary contempt proceeding. Moreover, we concluded that defendant's theory would:
violate the principle that the trial court must have inherent power to punish direct affronts to its authority swiftly, in order to ensure obedience to court orders and respect for the court. [180 N.J. Super. at 497].
Here, too, defendant erroneously relies upon Yengo in support of his claim that his good faith explanation required that the charge of contempt be adjudicated at a plenary hearing. For the reasons expressed in Hinsinger, we reject this argument. Furthermore, it is extremely doubtful that defendant's explanation  that his conduct was simply a human reaction  would be deemed "adequate" according to any standard. Cf. State v. Sax, 139 N.J. Super. 157, 159 (App.Div. 1976), certif. den. 70 N.J. 525 (1976) (defendant held in contempt despite his excuse that his abusive comment and gutter language was due to frustration). Nor does the possibility that the trial court erred in ruling on the Gilmore motion render defendant's conduct or explanation therefor acceptable. As the Supreme Court stated in Carton, supra:
There must be no defiance of a court, least of all by one of its officers. It is no excuse that the trial judge may be in error. Courts of appeal exist to hear such claims. One who is dissatisfied with the action of a court must obtain a stay or obey the order. He may not ignore it. [48 N.J. at 16].
Another ground on which defendant challenges the appropriateness of summary proceedings in this case is that the *574 trial court had become so personally embroiled in the matter that it was incapable of rendering a dispassionate decision. According to defendant, his "allegedly contemptuous conduct  expressions of disapproval with the judge's ruling  is one of the most direct and personal attacks on the judge, challenging not only his authority but his intellect as well." As evidence of the trial court's indignance and loss of objectivity, defendant claims that the trial court committed sundry errors in the course of the contempt proceedings. Thus, defendant maintains that this case "should have been heard by another judge pursuant to R. 1:10-2."
For several reasons, this argument is entitled to little credence. Preliminarily, one should note the inconsistency in defendant's position: while arguing that the alleged contumacious acts were so offensive as to require Judge Lechner to recuse himself, defendant also asserts that his conduct did not constitute contempt as a matter of law. Furthermore, defendant's argument is refuted by several reported decisions in which judges who were the target of conduct clearly more offensive than defendant's were permitted to preside at summary contempt proceedings. See, e.g., Vasky, supra, 203 N.J. Super. at 97 (although not the basis on which the trial court found defendant in contempt, the trial court heard defendant call it a "scumbag"); Gonzalez, supra, 134 N.J. Super. at 474 (defendant uttered vulgarities concerning all involved in the proceedings then directed additional scurrilous remarks to the court). But see Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767, 768, 775 (1925) (defendant's letter to the trial court stating that the judge was not "big enough to overcome ... personal prejudice" and accusing the judge of being influenced by extraneous, slanderous remarks required that a different judge hear the case on remand). In addition, the trial court did not commit the errors attributed to it by defendant. Thus, defendant's claim that the circumstances of this case warranted Judge Lechner to recuse himself is unfounded.
*575 Also unavailing is defendant's assertion that, because he faced incarceration and summary proceedings diminish one's due process rights, the least restrictive alternative of a R. 1:10-2 hearing should have been employed. In analyzing claims under the state constitution, our Supreme Court has "considered the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Greenberg v. Kimmelman, 99 N.J. 552, 567 (1985). See Right to Choose v. Byrne, 91 N.J. 287, 308-309 (1982). In light of the panoply of safeguards afforded an individual in a criminal contempt proceeding, and the compelling need for judges to be able immediately to quell disrespectful conduct committed in their presence, the factors set forth in Greenberg unquestionably point to upholding the use of summary contempt procedures in appropriate circumstances. In both the court rules it has adopted and numerous decisions, our Supreme Court has determined that the circumstances of a direct contempt, such as the one at issue here, are appropriate for invoking the summary contempt power. Likewise, the United States Supreme Court, while recognizing that `procedural regularity' has been a cornerstone in the development of our liberty, has condoned the use of summary contempt hearings in limited situations. Harris, supra, 382 U.S. at 166-169, 86 S.Ct. at 355-357, 15 L.Ed.2d at 243-244; In re Oliver, 333 U.S. 257, 275, 68 S.Ct. 499, 508, 92 L.Ed. 682, 695 (1948). Thus, defendant's argument that the right of procedural due process as guaranteed by our state and federal constitutions precludes summarily trying an individual for contempt must be rejected.

B.

Defendant Was Not Denied Due Process Of Law By Virtue Of The Alleged Procedural Irregularities In The Hearing.
Defendant further argues that even if resort to summary proceedings was justified, certain errors committed by the trial *576 court denied him procedural due process. Defendant alleges that the trial court found him in contempt before giving him an opportunity to speak. Therefore, defendant continues, he was denied his right to be heard. Furthermore, defendant maintains that by imposing a prison sentence without allowing him to consult with an attorney, the trial court deprived him of his right to counsel. According to defendant, these purported errors resulted in a proceeding which was fundamentally unfair and thus require a reversal of his conviction for contempt.
Defendant attaches great significance to the fact that before he was given a chance to speak, the trial court twice stated that it "finds him in contempt" and also declared that the jury will be released. According to defendant, these comments indicate that the trial court had found him in contempt before he was able to address the issues of guilt and punishment. Thus, defendant argues that his right of allocution was a "meaningless formalism" and he was, in essence, denied the opportunity to be heard.
In Vasky, supra, defendant was twice held in contempt for interrupting the proceedings. After admonishing defendant and having a lengthy confrontation with him, the trial court called a recess and, upon reconvening, stated:
Mr. Vasky, please stand. Mr. Vasky, I find that your action in refusing to obey the court's order [to be quiet] is in direct contempt in the face of the Court. I find you guilty of that contempt. Mr. Vasky, I'll hear you on the punishment for that contempt. [203 N.J. Super. at 95 (Emphasis supplied)].
Defendant used the opportunity to argue that the trial court had violated his constitutional rights and that no sentence should be imposed because he had done nothing wrong. Nonetheless, the trial court assessed a $250 fine for this conviction for contempt.
When defendant persisted in his obstreperous conduct, the trial court cleared the courtroom, again held defendant in contempt and allowed him to speak as to the sentence to be imposed. Defendant again protested that he had done nothing to warrant a finding of contempt. Thereafter, a sentence of 15 *577 days in jail was imposed. The underlying matter for which defendant was standing trial proceeded to conclusion without further interruption.
In its de novo review of the contempt convictions, this court addressed defendant's claim that he lacked the requisite mens rea to support a finding of criminal contempt. We thus noted:
While it is true that the trial judge did not specifically say that defendant had the opportunity to dispel the presence of criminal intent, it is evident that he was afforded that opportunity. The judge couched that opportunity in terms of inviting defendant to address himself to the sentence to be imposed. [Id. at 100].
This court adopted the trial court's findings of fact and affirmed both contempt convictions. In so holding, we explained "that the persistent refusal of defendant to accede to the directions of the trial judge constituted contempt in the face of the court and warranted his conviction for contempt." Id. at 101.
Vasky makes clear that a defendant is not denied his right to be heard merely because a trial court announces that it finds him in contempt before the defendant has had a chance to speak. The crucial consideration is whether a defendant is afforded an opportunity to address the court. Cf. United States v. Baldwin, 770 F.2d 1550, 1556 n. 11 (11th Cir.1985), cert. den. sub nom. Jackson v. United States, ___ U.S. ___, 106 S.Ct. 1636, 90 L.Ed.2d 182 (1986) (although defendant was summarily cited for contempt for being absent from court, the trial court would undoubtedly have modified its judgment had defendant's subsequent explanation brought to light facts not already known to the court). Here, defendant was in fact given that opportunity. After reading the definition of contempt as set forth in Vasky, the trial court here told defendant:
Now I will accord you an opportunity to show that you did not possess at the time the requisite mens rea ...
* * * * * * * *
You may be heard before I pass sentence.
*578 Defendant gave a lengthy explanation for his conduct, after which the trial court inquired whether he wished to say anything further or call any witnesses. Although declining to offer additional evidence on his behalf, defendant enjoyed a full right of allocation. His assertion to the contrary is unfounded.
Defendant also argues that the trial court's refusal to allow him to consult with an attorney constituted a violation of his right of procedural due process and right to counsel as guaranteed by our federal and state constitutions. With respect to his federal constitutional rights, defendant relies principally upon Argersinger v. Hamlin, 407 U.S. 25, 36, 92 S.Ct. 2006, 2012, 32 L.Ed.2d 530, 538 (1972), in which the United States Supreme Court held that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at trial." Regarding his rights under the New Jersey Constitution, defendant points to our Supreme Court's holding in Rodriguez v. Rosenblatt, 58 N.J. 281, 295 (1971), that "no indigent defendant should be subjected to a conviction entailing imprisonment in fact or other consequence of magnitude without first having had due and fair opportunity to have counsel assigned without cost." On the basis of these and several other cases, defendant maintains that his constitutional rights were violated and, therefore, his conviction for contempt must be reversed.
The United States Supreme Court's holding in Argersinger was motivated by several key considerations. In explaining why the assistance of counsel is a requisite to a fair trial, the Supreme Court noted:
The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law.... He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. [407 U.S. at 31, 92 S.Ct. at 2009, 32 L.Ed.2d at 535].
*579 Additionally, the concern that all defendants, rich and poor alike, stand equal before the law was instrumental in the Supreme Court's decision. The Argersinger court further reasoned that the need for counsel is just as urgent in petty-offense prosecutions where the issues involved are often as complex as those in felony cases. Another factor underlying the Supreme Court's decision was that misdemeanants as well as felons require guidance at the guilty plea stage to ensure that they understand the consequences of their pleas and that they are treated fairly by the prosecution. Also crucial to the Supreme Court's holding was the fact that the judicial system's preoccupation with the movement of cases frequently prejudices defendants charged with misdemeanors. The Supreme Court determined that the assistance of counsel was a necessary bulwark against this problem of assembly-line justice.
As Justice Powell pointed out in his concurrence in Argersinger, that case, like Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), embraced the larger concern of when the Due Process Clause requires that a defendant be represented by counsel. Argersinger, supra, 407 U.S. at 44-46, 92 S.Ct. at 2016-2017, 32 L.Ed.2d at 542-543 (Powell, J., concurring). The Supreme Court held that no person may be imprisoned for an offense unless he was represented by counsel at his trial, and, in reaching this conclusion, twice cited In re Oliver, supra. An examination of that decision provides guidance in the instant case.
In Oliver, petitioner was sentenced to 60 days imprisonment upon being convicted of contempt for allegedly testifying evasively before a one-man, judge-grand jury. While questioning petitioner in his capacity as a grand jury, the judge disbelieved petitioner's story, which conflicted with other testimony that had previously been given in a secret proceeding. The judge therefore charged petitioner with contempt. The summary contempt hearing, like the grand jury investigation which precipitated it, was likely conducted in the judge's chambers and was closed to the public.
*580 For several reasons, the United States Supreme Court concluded in Oliver that petitioner's conviction for contempt could not stand. One ground on which the conviction was overturned was that the contempt proceedings had been conducted in secret. The Court further held that the "failure to afford the petitioner a reasonable opportunity to defend himself against the charge of false and evasive swearing was a denial of due process of law." 333 U.S. at 273, 68 S.Ct. at 507, 92 L.Ed. at 694. The Supreme Court explained:
Except for a narrowly limited category of contempts, due process of law as explained in the Cooke Case requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent "demoralization of the court's authority" before the public. If some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements, due process requires, according to the Cooke Case, that the accused be accorded notice and a fair hearing as above set out. [Id. at 275, 68 S.Ct. at 508, 92 L.Ed. at 695 (Emphasis supplied)].
Because petitioner's contempt conviction was based, in part, upon testimony given in his absence, the Court concluded that that case did not fall within the narrow category of contempts which would allow abridging petitioner's due process rights.
Having cited to Oliver, the Argersinger court was undoubtedly aware of the implications of that decision  that an individual who commits contempt in the presence of the court can be tried instantly and sentenced to jail, even though he may not have been represented by counsel. Nonetheless, the Supreme Court did not overrule Oliver or modify that decision to comport with its holding in Argersinger. Thus, there is a compelling basis to conclude that the United States Supreme Court intended to keep intact the judicial power to punish summarily *581 for contempts in facie curiae. Defendant's argument to the contrary must be rejected.
Moreover, even in the unlikely event that Argersinger should be read as limiting the use of the summary contempt power, the instant case is not one in which any such limitation would apply. Defendant is not a layman who is innocent but too unskilled in the practice of law to establish that fact. He is an experienced trial attorney who obviously understood the charges brought against him and could have responded thereto. There was no danger that the complexity of the issues involved or the "assembly-line" nature of the hearing resulted in any prejudice that the presence of outside counsel would have averted. Likewise, defendant here was not indigent or unable to appreciate the consequences of a guilty plea. In short, none of the rationales underlying the holding in Argersinger are present here. Thus, Argersinger cannot and should not be interpreted as extending the right to counsel to defendant in this case.
Similarly, we are satisfied that, despite its holding in Rodriguez, supra, the New Jersey Supreme Court intended to preserve the courts' summary contempt power. Nine years after deciding Rodriguez, our Supreme Court upheld the use of summary contempt proceedings in Yengo. There is no indication in Yengo that defendant had outside counsel when he was summarily tried before the trial court. However, his conviction was affirmed. The Court recognized that summary proceedings diminish one's due process rights, but, nevertheless, upheld the summary contempt power as a necessary incident to maintaining the dignity of the court. In light of the holding in Yengo, defendant's reliance upon Rodriguez is misplaced. The instant case involved contempt in the presence of the court, and, therefore, due process did not mandate that defendant be represented by an attorney.
Consequently, as defendant's contumacious conduct occurred in the actual presence of the court and no evidence from other sources was necessary to adjudicate the contempt charge, the *582 trial court properly invoked summary procedures. In addition, there were no procedural irregularities in the contempt proceedings to warrant overturning defendant's conviction.

II.

DEFENDANT'S CONDUCT CONSTITUTED CONTEMPT AS A MATTER OF LAW
Defendant argues that his gestures and physical reactions did not materially disrupt the proceedings and, therefore, did not rise to the level of contempt. Defendant characterizes his conduct as a "human reaction," an "involuntary reflex or release of tension," and an "isolated incident [which] ... took place outside the presence of the jury." Moreover, he asserts that his comments to the trial court were not the basis of his being held in contempt and, furthermore, were not disrespectful. According to defendant, "[t]he only disruption in the proceeding came as a result of the judge's own reaction to [defendant's] off-the-record conduct and his decision to enter the contempt citation." Similarly, defendant maintains that he was cited for contempt not because he obstructed justice, but because the trial court took umbrage at his conduct. Other considerations which defendant asserts militate against a finding that his conduct was contumacious are an attorney's "duty to vigorously defend his client" and the "adversarial nature of the trial process." Lastly, defendant contends that he lacked the requisite mens rea to support his contempt conviction and also that the trial court improperly shifted to him the burden of proving that he lacked the necessary intent.
Although acknowledging the expansive definition of contempt employed by the courts of this State, defendant relies primarily upon federal cases in arguing that his conduct did not constitute contempt. Resort to federal case law is justified, in defendant's view, because the federal statute and rule are similar to those of New Jersey, because New Jersey courts have frequently looked to the larger body of federal law when *583 addressing issues of contempt and because the contempt power may implicate federal as well as state constitutional rights. To a certain extent, each of these observations is valid. However, they cannot obscure the overriding principle that, unless a provision of the United States Constitution is involved, federal precedent is in no way binding upon this tribunal. As the constitutional issues implicated in this appeal have already been addressed, this court may accord little significance to the federal cases cited by defendant. Reference to the law of other jurisdictions should be reserved for those issues not adequately covered by the abundance of New Jersey law dealing with contempt.
Citing myriad federal cases, defendant maintains that a finding of contempt will not lie absent a "material disruption in or obstruction of a matter pending." Indeed, this is a correct statement of federal law. See In re McConnell, 370 U.S. 230, 233, 82 S.Ct. 1288, 1290, 8 L.Ed.2d 434, 437 (1962); In re Michael, 326 U.S. 224, 226-229, 66 S.Ct. 78, 79-80, 90 L.Ed. 30, 32-33 (1945); Nye v. United States, 313 U.S. 33, 43-52, 61 S.Ct. 810, 813-817, 85 L.Ed. 1172, 1178-1182 (1941); United States v. Lowery, 733 F.2d 441, 445 (7th Cir.1984), cert. den. sub nom. Wolfson v. United States, 469 U.S. 932, 105 S.Ct. 327, 83 L.Ed.2d 264 (1984); United States v. Thoreen, 653 F.2d 1332, 1340 (9th Cir.1981), cert. den. 455 U.S. 938, 102 S.Ct. 1428, 71 L.Ed.2d 648 (1982); In re Gustafson, 650 F.2d 1017, 1020 (9th Cir.1981); Gordon v. United States, 592 F.2d 1215, 1217 (1st Cir.1979), cert. den. 441 U.S. 912, 99 S.Ct. 2011, 60 L.Ed.2d 384 (1979); Com. of Pa. v. L.U. 542, Intern. U of Op. Engrs., 552 F.2d 498, 509 (3d Cir.1977), cert. den. sub nom. Freedman v. Higginbotham, 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977); United States v. Seale, 461 F.2d 345, 369 (7th Cir.1972); In re Brown, 454 F.2d 999, 1003-1004 (D.C. Cir.1971). In contrast, we have been unable to find any reported New Jersey decision which holds that a material disruption is a sine qua non of a contempt conviction. Those cases which refer to the "obstruction of the administration of justice" explain that any conduct *584 which has such a tendency may be punished as contemptuous. See, e.g., Sarner, supra, 28 N.J. at 524; Van Sweringen v. Van Sweringen, 22 N.J. 440, 445 (1956); Harbor Tank Storage Co., Inc. v. De Angelis, 85 N.J. Super. 92, 99 (App.Div. 1964), aff'd 45 N.J. 539 (1965); State v. Jones, 105 N.J. Super. 493, 503 (Essex Co. 1969); In re Caruba, 139 N.J. Eq. 404, 411 (Ch. 1947), aff'd 140 N.J. Eq. 563 (E. & A. 1947), cert. den. 335 U.S. 846, 69 S.Ct. 69, 93 L.Ed. 396 (1948).
The reason for this difference between federal and New Jersey case law is apparent upon examining the respective statutes defining contempt. 18 U.S.C. § 401 provides:
A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as 
(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
(2) Misbehavior of any of its officers in their official transactions;
(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.
The New Jersey counterpart, N.J.S.A. 2A:10-1, reads:
The power of any court of this state to punish for contempt shall not be construed to extend to any case except the:
a. Misbehavior of any person in the actual presence of the court;
b. Misbehavior of any officer of the court in his official transactions; and
c. Disobedience or resistance by any court officer, or by any party, juror, witness or any person whatsoever to any lawful writ, process, judgment, order, or command of the court.
Nothing contained in this section shall be deemed to affect the inherent jurisdiction of the superior court to punish for contempt.
Although the statutes are similar, it is clear that the New Jersey statute is more encompassing. Under N.J.S.A. 2A:10-1 a, a court is empowered to sanction an individual for contempt for any misbehavior committed in its presence. Under 18 U.S.C. § 401(1), a federal court can exercise its contempt power only if the misbehavior committed in the face of the court obstructs the administration of justice.
In light of this distinction, we reject defendant's argument, based upon federal case law, that his conduct did not cause a material disruption and therefore was not contemptuous. *585 Simply put, the State need not prove that there was an obstruction of justice in order to sustain defendant's conviction. In this respect, Caruba, supra, is enlightening. There, defendant was held in contempt for committing perjury and, like defendant in the instant case, apparently argued that his conviction was improper because his conduct did not obstruct justice. Dismissing this argument, the Caruba court explained:
The federal cases cited in support of the argument that where there is no obstruction of justice there is no contempt are not controlling. They all arose out of contempt proceedings in inferior federal courts, the creatures of statute, having no common law jurisdiction in matters of contempt, and the decisions were controlled by statute. They need not be further considered here. None of the New Jersey cases cited is authority for the proposition advanced. They hold uniformly that any act or conduct which obstructs or tends to obstruct the course of justice constitutes a contempt of court. "The essence of contempt is that it obstructs or tends to obstruct the administration of justice." Fox, The History of Contempt of Court 216. And see Toledo Newspaper Co. v. United States, 247 U.S. 402 [38 S.Ct. 560, 62 L.Ed. 1186 (1918)]. [139 N.J. Eq. at 410-411 (Emphasis in the original)].
This reasoning applies with equal force to this case and warrants rejecting defendant's argument insofar as it is grounded in federal law.
Moreover, in Sax, supra, this court upheld a summary contempt conviction against a defendant who, after receiving a parking ticket, wrote a letter to a municipal court clerk containing obscenities and alleging "ugly" methods of collecting money. Similarly, this court held in State v. Gussman, 34 N.J. Super. 408 (App.Div. 1955), that a traffic ticket recipient's letter to a judge claiming that he would not receive a fair trial justified summarily convicting him for contempt. Clearly, there was no material disruption of the proceedings in either Sax or Gussman, but, nonetheless, this court opined that the convictions for contempt were warranted. Furthermore, both Sax and Gussman were cited with approval by the New Jersey Supreme Court in Yengo. 84 N.J. at 123. As Justice Handler noted in his concurrence in Yengo:
A trial need not grind to a halt before obstreperous conduct can be regarded as a contemptuous affront to judicial authority. The combination of a purposeful *586 attempt to interfere with the court and intentional acts which have the tendency to obstruct a court is sufficient. [84 N.J. at 136 (Handler, J., concurring)].
New Jersey courts have determined that any act in opposition to or which tends to lessen or bring into disrepute the court's authority or dignity is punishable as contempt. Vasky, supra, 203 N.J. Super. at 99; Gonzalez, supra, 134 N.J. Super. at 475. Under this standard, defendant's conduct was clearly contemptuous. During the first day of pretrial hearings, the trial court was indulgent of defendant's repeated challenges to its rulings on the polygraph issues. Defendant was afforded ample opportunity to contest each decision but his arguments were unavailing. Obviously disappointed, defendant flouted the court's authority by "shaking [his] head, smiling and being disrespectful" in response to the trial court's refusal to take judicial notice of certain polygraph articles. Upon being warned that further such antics would not be tolerated, defendant again acted defiantly, daring the trial court to take whatever action it deemed necessary. Thereafter, defendant apologized for his behavior and explained that it was a human response. A repetition of these laughing, mocking gestures on the following day culminated in defendant's citation for contempt. This conduct smacked of disrespect and, as the trial court stated, "besmirch[ed] what [was] going on in th[e] court." Moreover, the record suggests that the manner in which defendant addressed the trial court when given an opportunity to be heard was likewise insolent. Thus, the trial court was warranted in holding defendant in contempt.
The conclusion that defendant's conduct constituted contempt is in no way vitiated by the fact that it occurred while he was "vigorously defending" a client in a criminal matter. An attorney's actions which demean a trial court neither aid the search for truth nor conduce to the benefit of a defendant. Thus, eradicating this type of behavior through the contempt power will not threaten the "independence of the bar", "chill or effectively deny a defendant's right to counsel" or result in "an atmosphere of decorous understatement." As the United *587 States Supreme Court commented in Sacher v. United States, 343 U.S. 1, 13, 72 S.Ct. 451, 457, 96 L.Ed. 717, 726 (1952), in response to similar arguments, a court should:
unhesitatingly protect counsel in fearless, vigorous and effective performance of every duty pertaining to the office of the advocate on behalf of any person whatsoever. But it [should] not equate contempt with courage or insults with independence. It [should] also protect the processes of orderly trial, which is the supreme object of the lawyer's calling.
Moreover, measures which help insure that an attorney comports himself with proper etiquette in the courtroom are likely to better serve the interests of a criminal defendant. Despite defendant's responsibilities as a Public Defender, the contemptuous nature and recurrence of his conduct justified the trial court in summarily finding him in contempt.
Defendant further argues that he lacked the necessary intent to support his conviction for contempt and also that the trial court erroneously shifted the burden of proof regarding mens rea to him. It is well-settled that an essential element of the offense of contempt which must be proved beyond a reasonable doubt is willfulness or intentional conduct. Carton, supra, 48 N.J. at 19; N.J. Dept. of Health v. Roselle, 34 N.J. 331, 337 (1961). Here, after citing defendant for contempt, the trial court remarked:
Now I will accord you an opportunity to show that you did not possess at the time the requisite mens rea ...
Although defendant's argument that the trial court improperly required him to prove a lack of intent has surface appeal, an examination of the relevant law and the facts of this case discloses the flaws in this argument.
In Vasky, supra, defendant, who was twice held in contempt for persistently refusing to obey the directions of the trial court, likewise contended that his conduct was not willful or deliberate. As previously noted, the procedure followed in Vasky for each contempt citation was that the trial court found defendant in contempt and then told him that he could address the issue of punishment. Although the trial court made no *588 mention of defendant's mens rea, we upheld both convictions. With respect to the element of intent, we explained:
While it is true that the trial judge did not specifically say that defendant had the opportunity to dispel the presence of criminal intent, it is evident that he was afforded that opportunity. The judge couched that opportunity in terms of inviting defendant to address himself to the sentence to be imposed ... That defendant possessed the requisite intent is clearly demonstrated by the fact that he composed himself and ceased his interruptions of the court after the jail sentence was imposed. [203 N.J. Super. at 100 (Emphasis supplied)].
Because, in Vasky, the element of willfulness was readily inferable from the nature of defendant's conduct, we found that defendant had the requisite mens rea and, although given the opportunity to do so, was unable to dispel its existence. See Hinsinger, supra, 180 N.J. Super. at 497 ("[T]he contemnor must be accorded the opportunity, as defendant was here, to attempt to show that he did not possess the requisite mens rea.").
Vasky and Hinsinger make clear that, as with certain crimes, the very nature in which a contemptuous act is committed may support a finding that it was done with the requisite mens rea. Here, the trial court's finding that defendant acted willfully and deliberately is amply supported by the record. After the initial confrontation with the court on the first day of pretrial hearings, defendant was able to comport himself properly and, indeed, apologized to the trial court. Despite recognizing the impropriety of his conduct and showing that he could conduct himself in a manner befitting a court of law, defendant repeated his contumacious acts the following day. Moreover, in his brief, defendant attempts to defend his "expressions of disapproval" as a "tactical weapon" designed to influence subsequent decisions by the trial court. In so describing his behavior, defendant concedes that his conduct was intentional, done for a specific purpose. Thus, defendant's contention that "[i]t is difficult to characterize [his] physical reaction as volitional; it is impossible to conclude beyond a reasonable doubt that it was intentionally wrongful" is unpersuasive. Both the nature of defendant's conduct and his own admission about its *589 intended effect support the conclusion that defendant acted with the necessary mens rea. Since he did not offer an explanation to refute this finding, his conviction must stand.
Several other issues raised by defendant merit brief consideration. Defendant claims that the trial court's willingness to reduce his sentence in exchange for an apology evidences that the trial court had become personally embroiled and also that defendant could not have materially disrupted the proceedings. Logically unsound, this argument is refuted by federal decisions which have recognized the reasonableness of commuting a sentence when a defendant has shown remorse. Baldwin, supra, 770 F.2d at 1556 n. 11. See Groppi v. Leslie, 404 U.S. 496, 506 n. 11, 92 S.Ct. 582, 588 n. 11, 30 L.Ed.2d 632, 640 n. 11 (1972).
Defendant also suggests that the fact that his conduct occurred outside the presence of the jury weighs against concluding that it was contemptuous. In Gonzalez, defendant's acts of contempt were committed during sentencing and, thus, also occurred outside the jury's presence. Addressing this factor, the Gonzalez court explained:
That is a distinction without a difference. All the conditions which justify summary convictions for contempt during a trial were present here. Defendant's contemptuous conduct occurred in open court and was directly witnessed by the judge. Immediate treatment was necessary to preserve order and a deliberate atmosphere in the courtroom. [134 N.J. Super. at 477].
This reasoning applies with equal force here.
Lastly, defendant observes that holding that his conduct constituted contempt may have First Amendment implications. A similar argument was rejected by this court in Sax, supra, where it was noted that contumacious speech is not protected since it does not excite "society's interest in truth and individual liberties." 139 N.J. Super. at 160 (quoting Gussman, supra, 34 N.J. Super. at 413). Thus, these considerations do not warrant altering our conclusion that defendant's conduct constituted contempt. In our view, defendant's conduct clearly falls within the definition under which courts of this State have *590 punished such behavior as contemptuous. All elements of the offense, including defendant's mens rea, were established beyond a reasonable doubt.

III.

THE APPROPRIATENESS OF DEFENDANT'S PUNISHMENT
Finally, defendant contends that "the sentencing procedures used by the judge [were] so laden with error that the sentence imposed by the trial judge cannot stand." Specifically, defendant argues that the presumption against imprisonment was applicable to him and that, at the time of sentencing, the trial court failed to explain how that presumption was rebutted. Likewise, defendant maintains that the trial court considered neither the existence of any aggravating or mitigating factors nor whether his immediate incarceration would work an undue hardship on his family and/or clients. In defendant's view, the trial court's discussion of the aggravating and mitigating factors in the supplemental order was an "after-the-fact effort to cure the error" and cannot rectify the trial court's failure to consider certain crucial evidence before passing sentence. In conclusion, defendant claims entitlement "to a hearing to determine the appropriate sentence under the principles set forth in State v. Vasky."
While the trial court was required to consider the nature and circumstances of defendant's contempt, including aggravating and mitigating factors, it was not bound by the full gamut of sentencing provisions in our penal code. Although N.J.S.A. 2C:1-4 c provides that the Code's degree classification scheme applies to non-Code offenses, it is clear that the Legislature never intended the Code to apply to a court's contempt power. Thus, N.J.S.A. 2C:1-5 c, which addresses the general applicability of the Code provisions, states that:

*591 This section does not affect the power to punish for contempt, either summarily or after indictment, or to employ any sanction authorized by law for the enforcement of an order or a civil judgment or decree.
As explained in the commentary to N.J.S.A. 2C:1-5 c in II Final Report of the New Jersey Criminal Law Revision Commission (Oct. 1971) at 12:
Paragraph c makes it clear that it is not a purpose of the Code to deal with the judicial power to punish for contempt or to use sanctions to enforce an order or a civil judgment or decree, even though imprisonment may be employed. Cf., In re Buehrer, supra.

The cases upon which defendant relies in arguing that the Code provisions apply in the instant case, State v. Sobel, 183 N.J. Super. 473 (App.Div. 1982) and State v. Dachielle, 195 N.J. Super. 40 (Law.Div. 1984), both involved offenses under Title 24, the Controlled Dangerous Substances Act. As there is direct statutory support for applying the Code provisions to Title 24 offenses, see N.J.S.A. 2C:43-1 b; N.J.S.A. 2C:1-5 b, these cases are distinguishable from the instant controversy. Thus, contrary to what defendant avers, neither the presumption against incarceration nor many of the other Code provisions apply in the instant case.
However, defendant is correct in asserting that the trial court was required to consider certain factors before passing sentence. In Vasky, supra, we stressed the importance of the sentencing court's examining possible aggravating and mitigating factors, including whether or not an alleged contemnor has a prior criminal record or history of contumacious conduct. Such an inquiry is especially important when there is uncertainty surrounding a defendant's past. In addition, we held that the trial court should have determined the financial impact that defendant's 15-day sentence would have upon defendant and his family. This consideration may have suggested that the sentence be served on weekends and nights. Because none of these essential findings had been made, we were unable to assess the propriety of the 15-day jail term and, therefore, remanded the matter to the trial court.
*592 Here, the trial court stated in the March 24, 1986 supplemental order that "[t]he conduct of Mr. Daniels in this matter (as confirmed by his comments) and the need to deter him from similar future conduct was so significant that these two aggravating factors qualitatively outweighed all mitigating factors." The trial court reached this decision even though it assumed that every mitigating factor was applicable to defendant. According to the trial court, a balancing of the aggravating and mitigating factors and the belief that defendant's conduct "created an open threat to the orderly procedure of the Court" warranted the imposition of a custodial sentence.
Defendant's conduct occurred in a pretrial hearing outside the presence of the jury. Although this behavior was properly punishable as contempt, the circumstances suggest that the harm visited upon the judicial system was not too severe. Furthermore, being fined $500 and rebuked in open court undoubtedly impressed upon defendant the seriousness of his conduct and should deter him from similar acts in the future. Under the circumstances, we are satisfied that imprisonment was not an appropriate punishment for defendant's conduct.
Accordingly, we find defendant guilty beyond a reasonable doubt of the contempt charge and fine him $500. We deem this punishment to be adequate and, thus, vacate the custodial portion of the sentence imposed by the trial court.
SKILLMAN, J.A.D., dissenting.
I agree for the reasons stated in the majority's comprehensive opinion that defendant's alleged contempt was in the presence of the court and thus was subject to summary adjudication by the trial judge pursuant to R. 1:10-1, that the power to proceed pursuant to R. 1:10-1 was not lost by virtue of the delay in adjudicating the contempt, and that defendant was not entitled to counsel. However, I am unable to agree with the majority's conclusion that defendant's conduct constituted contempt *593 as a matter of law. In my view, there is evidence in the existing record on which a finding of contempt could be sustained, but this evidence is subject to dispute in important respects. Since we are required to conduct a de novo review of the record on appeal from an adjudication of contempt and the existing record is inadequate to enable us to properly perform this responsibility, I would refer the matter to a trial court to conduct an evidentiary hearing and to submit to us recommended findings of fact and conclusions of law before we decide the appeal.
The summary contempt power involves a delicate balance between conflicting imperatives of our judicial system. On the one hand, the power is indispensable to "protect the processes of orderly trial." Sacher v. United States, 343 U.S. 1, 14, 72 S.Ct. 451, 457, 96 L.Ed. 717 (1952). On the other hand, the power is capable of abuse for "... the court is at once the complainant, prosecutor, judge and executioner." In re Mattera, 34 N.J. 259, 272 (1961). Therefore, "[i]t is a power which can be justified by necessity alone." Ibid.; see generally, Kuhns, "The Summary Contempt Power: A Critique and a New Perspective," 88 Yale L.J. 39 (1978).
A summary contempt proceeding against an attorney for conduct during trial raises especially difficult problems. See Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954); Sacher v. United States, supra; In re Carton, 48 N.J. 9 (1966). The Third Circuit Court of Appeals has observed that:
A balance must be maintained, however, between the necessity for judicial power to curb obstruction of justice in the courtroom and the need for lawyers to present their clients' cases fairly, fearlessly, and strenuously. In preserving the balance, a court must not exercise its summary power of contempt to stifle courageous and zealous advocacy and thereby impair the independence of the bar. On the other hand, the dignity, the independence, and the control of the court must not be degraded by lawyers who "equate contempt with courage.... [T]he processes of orderly trial, which [are] the supreme object of the lawyer's calling," must be protected. Sacher v. United States, 343 U.S. 1, 14, 72 S.Ct. 451, 457, 96 L.Ed. 717 (1952). [Commonwealth of Pennsylvania v. Local 542, supra, 552 F.2d 498, 503 (3rd Cir.1977) cert. den. 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977)].
*594 To preserve the authority of the courts to conduct their proceedings in an orderly manner and at the same time to avoid abuses of the summary contempt power, substantive and procedural limitations have been imposed upon its exercise. Substantively, to constitute contempt an act "... must be accompanied by a mens rea, a willfulness, an indifference to the court's command." New Jersey Dep't of Health v. Roselle, 34 N.J. 331, 337 (1961); In re Mattera, supra, 34 N.J. at 273. Furthermore, the act must be more than a minor breach of proper courtroom decorum. See In re McConnell, 370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962). Rather, because "[t]he sole credible basis for the summary contempt process is necessity, a need that the assigned role of the judiciary be not frustrated," In re Fair Lawn Education Ass'n, 63 N.J. 112, 114-115 (1973), cert. den. 414 U.S. 855, 94 S.Ct. 155, 38 L.Ed.2d 104 (1973), this power may be invoked only when the interference or threat of interference with the judicial process is imminent. Eaton v. Tulsa, 415 U.S. 697, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974).
The majority states that while the contempt power may be invoked in the federal courts only for an act which causes a "material disruption in or obstruction of a matter pending," the power may be invoked in the New Jersey courts for any conduct which "tends to obstruct the course of justice" (at 583-584; emphasis added). Although our courts have described the scope of the summary contempt power in more expansive terms than the federal courts, see, e.g., In re Caruba, 139 N.J. Eq. 404, 410-411 (Ch. 1947), aff'd 140 N.J. Eq. 563 (E. & A. 1947), cert. den. 335 U.S. 846, 69 S.Ct. 69, 93 L.Ed. 396 (1948), it is important not to overstate the magnitude of the difference between the federal and New Jersey standards for contempt. Our cases state as strongly as the federal cases that the summary contempt power should be invoked only in circumstances where it is necessary. Compare Taylor v. Hayes, 418 U.S. 488, 496-500, 94 S.Ct. 2697, 2702-2704, 41 L.Ed.2d 897 (1974) and Harris v. United States, 382 U.S. 162, 167, 86 S.Ct. 352, 355, 15 L.Ed.2d 240 (1965) with In re Yengo, 84 N.J. 111, *595 122 (1980), cert. den. 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981) and In re Mattera, supra, 34 N.J. at 272. Furthermore, there are federal constitutional limitations upon a state court's exercise of the summary contempt power. See, e.g., Eaton v. Tulsa, supra; Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); Holt v. Virginia, 381 U.S. 131, 85 S.Ct. 1375, 14 L.Ed.2d 290 (1965); In re Little, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972). For a party's conduct to be punishable as contempt, it "... must constitute an imminent, not merely a likely, threat to the administration of justice." Eaton v. Tulsa, supra, 415 U.S. at 698, 94 S.Ct. at 1229, quoting Craig v. Harney, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed.2d 1546 (1947). Thus, the Court has held that due process was denied by state courts summarily adjudicating contempts on the basis in Eaton v. Tulsa of a party referring to another party in open court as "chicken shit" and in In re Little in a pro se defendant asserting in his summation that the trial judge "was biased and had prejudged the case and that [defendant] was a political prisoner." Therefore, while I agree with the majority's conclusion that conduct in our courts which has a "tendency to" obstruct the administration of justice may be contempt, I would conclude that the tendency must be immediate and direct before the "necessity" for invocation of the contempt power can arise.
The procedural safeguards imposed upon the exercise of the contempt power include the presumption of innocence, the privilege against self-incrimination, the right of cross-examination, the admissibility of evidence in accordance with the rules of evidence and the requirement of proof beyond a reasonable doubt. In re Yengo, supra, 84 N.J. at 120. Furthermore, except when a contempt occurs in the actual presence of the judge, it must be heard by a judge other than the one allegedly offended. R. 1:10-1, 1:10-2 and 1:10-4; see In re Yengo, supra, 84 N.J. at 121.
The procedural safeguard most significant to this appeal is that an appellate court is required to make an independent de *596 novo review of a finding of contempt "on the law and on the facts." R. 2:10-4; see In re Yengo, supra, at 127; In re Hinsinger, 180 N.J. Super. 491, 498 (App.Div. 1981). We have observed that "[t]his extraordinary review is given doubtless because in the court of first instance the same judicial officer directs the contempt proceeding to be initiated, appoints the prosecutor, tries the facts, imposes the penalty and may also be unconsciously influenced by the circumstance that he presides over the court against which the alleged contempt was aimed." Zimmerman v. Zimmerman, 12 N.J. Super. 61, 69 (App.Div. 1950). On another occasion, we observed that "[t]he nature of our review stands `as a bulwark against an attenuation of the rights of an accused.'" State v. Vasky, 203 N.J. Super. 91, 100 (App.Div. 1985), quoting In re Education Assoc. of Passaic, Inc., 117 N.J. Super. 255, 259 (App.Div. 1971), certif. den. 60 N.J. 198 (1972). The unrestrained exercise of this power of de novo review is especially important with respect to a contempt in the presence of the court which has been summarily adjudicated by the offended judge. See In re Yengo, supra, 84 N.J. at 127; see also In re Contempt of Ungar, 160 N.J. Super. 322 (App. Div. 1978).
Under the statute which governed appeals of contempts from 1884 to 1948, the trial de novo on appeal would be based upon evidence presented in the appellate court. See Attorney General v. Verdon, 90 N.J.L. 494 (E. & A. 1917); Zimmerman v. Zimmerman, supra, 12 N.J. Super. at 68-69. Such evidence would be obtained "by depositions or in such other way or manner as the court above shall direct." L. 1884, c. 147, § 2. However, this provision was deleted in 1948. L. 1948, c. 333, § 1 and 2. Consequently, the de novo review on an appeal from an adjudication of contempt is now ordinarily based entirely on the trial record. See In re Yengo, supra; Zimmerman v. Zimmerman, supra, 12 N.J. Super. at 69. However, this court's authority to order supplementation of the trial record is implicit in the broad responsibility conferred upon us by R. 2:10-4 to conduct a de novo review of the facts underlying a *597 contempt. As we stated in State v. Zarafu, 35 N.J. Super. 177, 184 (App.Div. 1955), involving contempt in the presence of a municipal court, "it would be improper to proceed to a disposition of the matter on the merits where the accused did not have a full opportunity to present his side of the case at the original proceeding." See also Zimmerman v. Zimmerman, supra, 12 N.J. Super. at 69.
Although this court has the authority to order supplementation of the record on appeal from an adjudication of contempt, it should be emphasized that the trial record is ordinarily sufficient for a de novo review of the facts. In regard to contempts outside the presence of the court, R. 1:10-2 and 1:10-4 contemplate proceedings in which most of the procedural formalities of a conventional trial are followed, including notice to the accused, the right to counsel, the right to confrontation and the right to summon witnesses. See In re Carton, supra, 48 N.J. at 21-22; see also In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). Hence, it is highly unlikely that such a proceeding would produce a record which would be inadequate for de novo review on appeal. In regard to contempts within the presence of the court, R. 1:10-1 authorizes summary proceedings which lack the normal procedural safeguards of a criminal trial. There is no advance notice of the initiation of the proceedings, no right to counsel and often significant limitations on the opportunity to present a defense. See In re Yengo, supra, 84 N.J. at 121; In re Lependorf, 212 N.J. Super. 284, 292-293 (App.Div. 1986). Nevertheless, experience shows that the trial record is ordinarily adequate for de novo review of contempts in the presence of the court, because the alleged contemptuous conduct, as well as any defense to the charge, is usually clear from the trial record. Thus, where an attorney is late arriving in court, see In re Dias, 76 N.J. Super. 337, 340 (App.Div. 1962), or fails to appear at all, see In re Yengo, supra, the failure, as well as any excuse offered by the accused, are generally clear from the trial record. Similarly, where a contempt consists of derogatory or insulting language used in open *598 court, this language will appear in the stenographic record. See State v. Gonzalez, 134 N.J. Super. 472 (App.Div. 1975), aff'd in part and rev'd in part, 69 N.J. 397 (1975).
The contempt involved in this appeal is unusual in that it does not consist of conduct or language which is unambiguously set forth on the trial record. Rather, it consists of facial expressions and gestures. I have no doubt that such conduct can be as contemptuous as the spoken word, and that it would be subject to summary adjudication as a contempt in the presence of the court. However, this form of contempt presents some unique problems. First of all, a court must be cognizant of the fact that persons may make facial grimaces and other gestures unwittingly, especially when they are under emotional stress. Therefore, it may be more difficult than in a case involving another form of contempt for a court to determine whether a facial expression or gesture is made willfully with an intention to disrupt or to cause disrespect for the court. Secondly, while language in the courtroom which has been found contemptuous may be directly reviewed from the stenographic record, an appellate court must rely upon descriptions by observers to determine whether facial expressions and gestures were contemptuous. And since observers may describe an accused's courtroom demeanor differently, an evidentiary hearing may be required to resolve those differences.
I am convinced that the record in this case contains conflicts and ambiguities concerning defendant's conduct and intentions which require supplementation of the record to enable us to discharge our responsibilities of de novo review. I have no doubt that the facts set forth in the trial judge's supplemental order of March 24, 1986 and summarized in the majority's opinion (at 562-564) would constitute contempt. However, the certification of facts contained in the trial judge's supplemental order is disputed in a number of material respects. Thus, the trial judge's certification recites that
... on March 19, 1986, Mr. Daniels reacted with expressions exhibiting disrespect, disdain and scorn similar to but more egregious than his conduct of the *599 prior day. While I was placing on the record my findings and holding, Mr. Daniels again laughed, threw himself back into his chair, shook his head and covered his eyes.
This certification also recites that a number of defendant's statements were made "in a disrespectful manner," "with a contemptuous voice" and "sarcastically." On the other hand, the clerk of the trial court has submitted an affidavit, which has been made part of the appellate record,[1] which states in pertinent part:
4. After hearing arguments from both counsel, the Court began to render its decision. At that time, I was not looking at Mr. Daniels and therefore did not see Mr. Daniels make any gestures. I was, however, seated only a few feet from Mr. Daniels. Prior to being held in contempt, I did not hear Mr. Daniels say a word or utter any sound.
5. After being held in contempt, the Court gave Mr. Daniels an opportunity to be heard. When Mr. Daniels addressed the Court, he vigorously defended his position.
Mr. Daniels aggressively stated his opinion. He was not sarcastic or disrespectful in his manner or tone of voice.
In addition, defendant expressly denied on the record that he had made any disrespectful gestures.
Several of defendant's statements quoted by the majority unquestionably exhibit a confrontational approach towards the trial judge. However, apart from the disputed facial expressions and gestures, these statements would not constitute "an imminent... threat to the administration of justice." Eaton v. Tulsa, supra, 415 U.S. at 698, 94 S.Ct. at 1229. Nor could it be concluded that these statements were made willfully with "... an indifference to the court's command." New Jersey Dep't of Health v. Roselle, supra, 34 N.J. at 337. Therefore, the *600 undisputed parts of the trial record do not establish that defendant committed a contempt of court. See In re Little, supra; State v. Jones, 105 N.J. Super. 493 (Law Div. 1969).
There is an understandable reluctance to order an evidentiary hearing in which the trial judge may need to be called as a witness. However, where a trial judge's certification of facts differs in material respects from other evidence in the record, such a hearing is mandated. See State v. Jones, supra. Our responsibility to conduct a de novo review of the facts on an appeal from an adjudication of contempt precludes us from simply accepting a trial judge's certification and rejecting conflicting evidence without a hearing.
Where a trial record is not adequate for a complete and fair review of an adjudication of contempt, it is appropriate under some circumstances to remand the matter to the trial judge. See, e.g., State v. Zoppi, 72 N.J. Super. 432, 437 (App.Div. 1962); State v. Zarafu, supra. However, this would not be an appropriate disposition under the circumstances of the present case because the trial judge may need to be called as a witness at the hearing.[2] Furthermore, as I view this case, what is now required is not a rehearing of the contempt at the trial level pursuant to R. 1:10-2 and 1:10-4, but rather a hearing to develop a complete record for de novo appellate review of a contempt properly adjudicated pursuant to R. 1:10-1. In this procedural posture, the most appropriate disposition is to retain jurisdiction and to refer the matter to an appropriate trial court to hear the evidence and to submit to us recommended findings of fact and conclusions of law.
Accordingly, I dissent from the judgment adjudicating defendant guilty of contempt based on the existing record.
NOTES
[1] We granted defendant's motion to supplement the record with his affidavit and that of the clerk. We also granted a motion by the State to supplement the record with an affidavit of the assistant prosecutor who handled the underlying criminal case in which the alleged contempt occurred. The better practice would have been for these affidavits to have been presented to the trial court in connection with a motion to reconsider the order of contempt. However, the summary nature of proceedings under R. 1:10-1 requires that a liberal approach be taken to any motion to supplement the record on appeal.
[2] A remand to the trial judge would not be possible in any event because he is no longer on the state bench.